# NATIONAL LABOR RELATIONS BOARD *v.* INTERNATIONAL LONGSHOREMEN'S ASSN., AFL–CIO, ET AL.

No. 84–861.   Argued April 23, 1985—Decided June 27, 1985

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post*, p. 84.

*Norton J. Come* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Fried, David A. Strauss,* and *Linda Sher. J. Alan Lips* argued the cause for the American Trucking Associations, Inc., et al., respondents under this Court's Rule 19.6 in support of petitioner. With him on the briefs were *Mark E. Lutz* and *Kenneth E. Siegel.* Briefs in support of petitioner were filed by *William L. Auten* for Houff Transfer, Inc., *William H. Towle* for the American Warehousemen's Association, and *David Previant, Robert M. Baptiste,* and *Roland P. Wilder, Jr.,* for the International Brotherhood

of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, all respondents under this Court's Rule 19.6.

*Donato Caruso* argued the cause for respondent New York Shipping Association, Inc. *Ernest L. Mathews, Jr.,* argued the cause for respondent International Longshoremen's Association, AFL–CIO. With them on the brief were *C. P. Lambos, Thomas W. Gleason,* and *Francis A. Scanlan.**

JUSTICE BRENNAN delivered the opinion of the Court.

The Rules on Containers are collectively bargained-for guidelines requiring marine shipping companies to allow some of the large cargo containers that they own or lease to be loaded or unloaded by longshoremen at the pier. In *NLRB* v. *Longshoremen,* 447 U. S. 490 (1980) *(ILA I),* we reviewed the National Labor Relations Board's conclusion that the Rules and their enforcement constituted unlawful secondary activity under §§ 8(b)(4)(B) and 8(e) of the National Labor Relations Act, as amended, 29 U. S. C. §§ 158(b)(4) (B) and 158(e). Respondent union, the International Longshoremen's Association (ILA), defended the Rules as lawful under the "work preservation" doctrine of *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612 (1967). We ruled, however, that the Board's preliminary definition of the work in dispute had been legally erroneous, because it focused on the off-pier work of nonlongshoremen rather than on the work of longshoremen sought to be preserved. 447 U. S., at 507–508. We therefore affirmed the Court of Appeals' remand of the Rules to the Board, directing it to "focus on the work of the bargaining unit employees, not

---

*Dixie L. Atwater* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

*George Kaufmann, David Silberman,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

*Stephen E. Tallent* and *William F. Highberger* filed a brief for Delta Steamship Lines, Inc., as *amicus curiae.*

on the work of other employees who may be doing the same or similar work." *Id.*, at 507. The Board then sustained the Rules, but held that their enforcement against "short-stopping" truckers and "traditional" warehousers is unlawful. 266 N. L. R. B. 230 (1983). The question now presented is whether the Board's partial invalidation of the Rules as applied in these two contexts is consistent with *ILA I.*

## I

At issue is the response of unionized dockworkers to a technological innovation known as "containerization." Traditionally, longshoremen employed by steamship or stevedoring companies loaded and unloaded cargo into and out of oceangoing vessels at the pier. Cargo arriving at the pier by truck was "transferred piece by piece from the truck's tailgate to the ship by longshoremen . . . . The longshoremen checked the cargo, sorted it, placed it on pallets and moved it by forklift to the side of the ship, and lifted it by means of a sling or hook into the ship's hold. The process was reversed for cargo taken off incoming ships." 447 U. S., at 495. As we explained in some detail in *ILA I*, the advent of containerization some 25 years ago profoundly transformed this traditional pattern, by reducing the cost of ocean cargo transport and "largely eliminat[ing] the need for cargo handling at intermediate stages." *Id.*, at 509.[1]

---

[1] Containers are large metal boxes designed to fit without adjustment into the holds of special ships and onto the chassis of special trucks and railroad cars. "Because cargo does not have to be handled and repacked as it moves from the warehouse by truck to dock, into the vessel, then from the vessel to the dock and by truck or rail to its destination, the costs of handling are greatly reduced. Expenses of separate export packaging, storage, losses from pilferage and breakage, and costs of insurance and processing cargo documents may also be decreased. Perhaps most significantly, a container ship can be loaded or unloaded in a fraction of the time required for a conventional ship. As a result, the unprofitable in-port time of each ship is reduced, and a smaller number of ships are needed to carry a given volume of cargo." *NLRB* v. *Longshoremen,* 447 U. S. 490, 494–495 (1980).

It is thus unsurprising that "the amount of on-pier work involved in cargo handling has been drastically reduced" and that containerization has been since its inception a "hotly disputed topic of collective bargaining" between the ILA and the marine shipping companies. *Id.*, at 495–496. The Rules are the evolutionary product of the ILA's bargaining efforts that began with the introduction of the first oceangoing container ship in the Port of New York in 1957.[2]

The Rules do not require that *all* containers be loaded or unloaded by longshoremen at the pier. Instead, they apply only to containers that would otherwise be loaded or unloaded within the local port area, defined for convenience as

---

[2] The Administrative Law Judge (ALJ) in this case characterized the ILA's position regarding containers as "one of resistence [sic]" from the outset. 266 N. L. R. B. 230, 244 (1983). The 1959 agreement between the ILA and the New York Shipping Association, a multiemployer bargaining group for marine shipping companies in New York, reserved for longshoremen "[a]ny work performed in connection with the loading and discharging of containers . . . which is performed in the Port." *Ibid.* Discontent continued, however, over increasing off-pier use of containers. In 1969, after the lengthiest longshoremen's strike in the history of the Port of New York, a set of Rules substantially similar to the current Rules was negotiated. The Rules were recognized as a compromise, reserving for the ILA only about 20% of the total containerized cargo handled in New York. Nevertheless, the next five years were marked by work slowdowns and stoppages related to containerization, and the Rules were amended several times to increase their enforceability.

The text of the current Rules is substantively identical to the Rules printed as an Appendix to *ILA I.* 447 U. S., at 513–522. These Rules have been negotiated between the ILA and the Council of North Atlantic Shipping Associations, a multiemployer bargaining group encompassing the marine shipping companies in 36 major ports on the Atlantic and Gulf coasts. Longshoremen on the west coast are represented by a different union, the International Longshoremen and Warehousemen's Union. Although containerization has been a controversial collective-bargaining topic on the west coast as well, see Ross, Waterfront Lab. Response to Technological Change: A Tale of Two Unions, 21 Labor L. J. 397 (1970), only the ILA and the Atlantic and Gulf coast shippers are before the Court in this case.

anywhere within a 50-mile radius of the port. Rule 1(a).[3] Containers directly coming from or going to points beyond the 50-mile radius are not affected by the Rules. Rule 2. Even within the 50-mile area, containers that go directly to the owner of the cargo or to "bona fide" warehouses are exempted from the Rules. Rules 1(a)(2) and (3), 2(B)(4).[4] To ensure compliance, a fine of $1,000 is levied against a marine shipping company for each of its containers that it allows to be handled in violation of the Rules. Rule 7(c). As we noted in *ILA I:* "The practical effect of the Rules is that some 80% of containers pass over the piers intact. The remaining 20% are [loaded and unloaded] by longshoremen, regardless of whether that work duplicates work done by non-ILA employees off-pier." 447 U. S., at 499.

Although the marine shipping companies and longshoremen have accepted the various compromises that the Rules represent, three groups of non-ILA employers are unhappy

---

[3] The ALJ found that the 50-mile rule developed from the use of the description "50 miles from Columbus Circle" to resolve early container-related grievances in New York. 266 N. L. R. B., at 245, n. 24. The Board approved the 50-mile rule as "a rational attempt to claim only that work actually performed in the general area surrounding the port." *Id.,* at 235.

[4] A warehouse is deemed "bona fide" if the container is to remain in storage at the warehouse for 30 days or more. Rule 2(B)(4). The ALJ found that this 30-day rule, like the 50-mile rule, represents a negotiated attempt to preserve traditional work patterns; it distinguishes traditional, pre-containerization warehouse functions from "warehouses . . . being used as 'drop points' for [container unloading] and reloading immediately onto trucks." 266 N. L. R. B., at 257. As the Board found, prior to containerization some short-term cargo storage work was performed by longshoremen at marine terminal warehouses, and containerization has "diverted" some of this traditional longshore work to off-pier warehouses. *Id.,* at 236. The 30-day rule was therefore approved as "a rational attempt to distinguish between short-term storage at a marine terminal warehouse and long-term storage at an inland public warehouse." *Ibid.*

The Rules also do not apply to "container loads of mail, household effects of a person who is relocating his place of residence, with no other type of cargo in the container, or personal effects of military personnel." Rules 2(A)(4) and (B)(4).

with the Rules. Freight consolidators, truckers, and warehousers all also load and unload containers. Freight consolidators are in the business of arranging for small loads of cargo to be delivered to their off-pier facilities, where consolidator employees combine the cargo with cargo from other parties to pack full containers, which are then delivered to the pier. Consolidators also receive from incoming vessels containers packed with several parties' cargo, which they unload and disperse to the respective owners.

Unlike consolidators, many of whose businesses have been founded on containerization, some truckers and warehousers have always performed some off-pier cargo handling work. For example, prior to containerization, some interstate truckers would pick up cargo at the pier, drive a short distance to a central facility, and then unload and reload the cargo to meet weight, safety, or delivery requirements. Such unloading and reloading near the pier still sometimes occurs, even if the cargo is picked up in containers. The trucking practice of stopping in the vicinity of the pier to unload and reload cargo for reasons related to trucking requirements is known as "shortstopping." Similarly, some warehousers have always performed some loading and unloading of cargo stored at the warehouse for reasons unrelated to marine transportation; such cargo handling is still sometimes necessary even though cargo is shipped in containers.[5]

All these facts were before the Court in *ILA I*. We did not find that any of them required invalidation of the Rules. Instead, because we found that the Board had erred as a matter of law in defining the "work" in controversy, we remanded to the Board for further proceedings. 447 U. S., at

---

[5] The Board accepted the ALJ's findings that such "traditional" warehouse cargo handling work is performed in connection with, for example, "the ongoing storage of a manufacturer's goods for distribution on short notice to customers based on future orders and the ongoing storage of a company's purchased inventory for distribution on short notice to its foreign facilities as demand required." 266 N. L. R. B., at 236.

512–513. Nine cases involving charges of unfair labor practices filed by consolidators, truckers, or warehousers against the ILA were then consolidated by the Board and sent to an Administrative Law Judge (ALJ) for factfinding and disposition.[6] The charging parties claimed generally that the Rules constitute an unlawful agreement in violation of § 8(e),[7] and that enforcement of the Rules, which has resulted in marine transport companies not dealing with certain off-pier

---

[6] Two cases were vacated and remanded in *ILA I*. *International Longshoremen's Assn. (Dolphin Forwarding)*, 236 N. L. R. B. 525 (1978) (consolidators), and *International Longshoremen's Assn. (Associated Transport)*, 231 N. L. R. B. 351 (1977) (truckers), enf. denied, 613 F. 2d 890 (1979), vacated and remanded, 447 U. S. 490 (1980). Three cases were remanded by Courts of Appeals in light of *ILA I*. *International Longshoremen's Assn. (Consolidated Express)*, 221 N. L. R. B. 956 (1975) (consolidators), enf'd, 537 F. 2d 706 (CA2 1976), cert. denied, 429 U. S. 1041, same case, 602 F. 2d 494 (CA3 1979), vacated and remanded, 448 U. S. 902 (1980), remanded, 641 F. 2d 90 (CA3 1981); *International Longshoremen's Assn. (Beck Arabia)*, 245 N. L. R. B. 1325 (1979) (remanded by CA4) (warehousers); *International Longshoremen's Assn. (Puerto Rico Marine Management)*, 245 N. L. R. B. 1320 (1979) (remanded by CA5) (consolidators). The Board itself decided to reconsider one case, *International Longshoremen's Assn. (Terminal Corp.)*, 250 N. L. R. B. 8 (1980) (warehousers), and to add two other pending complaints, *International Longshoremen's Assn. (Hill Creek Farms)*, Nos. 4–CC–1133 and 4–CE–55 (warehousers), and *International Longshoremen's Assn. (Custom Brokers)*, No. 12–CE–30 (consolidators). The ninth case was added by the Board when its General Counsel subsequently issued a complaint. *International Longshoremen's Assn. (American Trucking)*, Nos. 22–CC–806, 807, 808, 809, and 810 and 22–CE–44, 45, 46, 47, and 48 (truckers). See *American Trucking Assns., Inc.* v. *NLRB*, 734 F. 2d 966, 975, n. 6 (1984); 266 N. L. R. B., at 232.

[7] "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible *[sic]* and void . . . ." 29 U. S. C. § 158(e).

employers, constitutes secondary boycotting illegal under
§ 8(b)(4)(B).[8]

In a detailed opinion, the ALJ sustained the Rules as a
valid work preservation agreement. He found that the "his-
toric jurisdiction" of longshoremen "includes all work in con-
nection with the loading and unloading of cargo on ships, . . .
including such related intermediate steps as receipt, storage,
sorting, checking, palletizing, cargo repair, carpentry, main-
tenance and delivery." 266 N. L. R. B., at 247. He re-
jected the argument that containerization has so changed
the character of the cargo transportation industry that this
work has simply disappeared.[9] Noting that the Rules are

---

[8] "It shall be an unfair labor practice for a labor organization or its
agents —

.          .          .          .          .

"(4) . . . (ii) to threaten, coerce, or restrain any person engaged in com-
merce or in an industry affecting commerce where in either case an object
thereof is —
"(B) forcing or requiring any person to cease using, selling, handling,
transporting, or otherwise dealing in the products of any other producer,
processor, or manufacturer, or to cease doing business with any other
person . . . Provided: that nothing contained in this clause (B) shall be
construed to make unlawful, where not otherwise unlawful, any primary
strike or primary picketing . . . ." 29 U. S. C. § 158(b)(4)(B).
Some of the unfair labor charges in these cases were filed due to cessa-
tions of business with off-pier employers by marine shipping companies
after the companies were fined by the ILA for allowing "shortstoppers"
and warehousers to handle containers in violation of the Rules. See ILA
I, 447 U. S., at 500–502. Others were filed prior to the Rules taking effect
in various ports. See, e. g., 266 N. L. R. B., at 267–268. Thus the
charges are based on facts somewhat attenuated from a direct application
of the Rules themselves. The record is silent regarding whether any
off-pier employers have actually "lost" work when longshoremen load or
unload containers in compliance with the Rules.
[9] In ILA I we noted that the charging parties argued that "containeriza-
tion has worked such fundamental changes in the industry that the work
formerly done at the pier by both longshoremen and employees of motor
carriers has been completely eliminated." 447 U. S., at 510–511. We re-
manded the issue to the Board without commenting on the merits because

"narrowly tailored" to preserve only the work of loading and unloading containers, and that "[n]o other work is sought," *id.*, at 251, the ALJ also found that "the Rules merely restore to the unit work traditionally performed by the ILA." *Id.*, at 252. With regard to the alleged secondary nature of the Rules, the ALJ found that the Rules have a clear work-preserving objective and that no secondary motivation was shown: "On this record, there can be little question that . . . the Rules represented a negotiated response to accommodate the . . . inroads on ILA work jurisdiction" caused by containerization, and "the evidence fails to disclose any significant ILA interest in the labor relations of the [off-pier] employers boycotted by the Rules." *Id.*, at 248–249.[10]

The ALJ did not end his inquiry there, however. He concluded that despite the work preservation objective of the Rules, they might still be invalid if they had the effect of reserving for longshoremen cargo handling work that had been done by nonlongshore labor prior to containerization and thus was not "created" by containerization. *Id.*, at 252. The ALJ reasoned that "to the extent that the Rules seek to compensate longshoremen for losses at the expense of inland employees whose jobs did not derive from containerization, a

---

it was "not appropriate for initial consideration by reviewing courts." *Id.*, at 511. On remand, the ALJ found that someone must still move cargo into and out of containers, and that "[t]here is no *inseparable* integration of these tasks with other labor functions or technology." 266 N. L. R. B., at 251 (emphasis in original).

[10] The ALJ also found that (1) the ILA has not "abandoned" its claim to container work, *id.*, at 260; (2) the marine shipping companies have the "right to control" the work in question because they own or lease the containers themselves, *id.*, at 261; and (3) the shipping companies' right to control the containers they own was not affected by a ruling by the Federal Maritime Commission (which has since been vacated by the Court of Appeals for the District of Columbia Circuit, *Council of North Atlantic Shipping Assns.* v. *FMC*, 223 U. S. App. D. C. 323, 690 F. 2d 1060 (1982)). 266 N. L. R. B., at 266–267. These findings were approved by the Board and the Court of Appeals as supported by substantial evidence, and are not at issue here.

proscribed 'work acquisition' objective would attach." *Ibid.*
He then found that, although the "skills utilized . . . are indis-
tinct from those of deep sea longshoremen," cargo handling
work done by shortstoppers and "traditional" warehousers is
work "assumed for a different purpose" than longshore cargo
handling and "preexisted" containerization. *Id.*, at 256. He
declared that the Rules therefore took on an impermissible
secondary character when applied in those two contexts, and
sustained unfair labor charges in three cases.[11]

The Board adopted the ALJ's findings and conclusions,
stating that "the ILA had an overall work preservation
objective in negotiating the Rules," and that "the work
of loading and unloading containers claimed by the Rules is
functionally related to the traditional loading and unloading
work of the longshoremen." *Id.*, at 236, 237. The Board
therefore held the Rules lawful as a general matter. It also
agreed with the ALJ's partial invalidation "as applied," how-
ever, after modifying the ALJ's views in two respects.

First, the Board provided a definition of "the work in dis-
pute," because the ALJ had not done so explicitly. *Id.*, at
236. Second, the Board rejected the ALJ's "findings that an
illegal work acquisition objective is revealed in the Rules,"

---

[11] *Associated Transport* ("shortstopping"); *Terminal Corp.* (warehous-
ing); *Beck Arabia* (warehousing). 266 N. L. R. B., at 268, 269–270. Un-
fair labor charges also were sustained in *Custom Brokers*, but on a finding
that the Rules had been employed in an unlawful attempt to organize two
nonunion off-pier employers. 266 N. L. R. B., at 270–271. This finding
was not challenged on appeal, 734 F. 2d, at 976, n. 7, and the *Customs
Brokers* violations are not before us.

With respect to freight consolidators, the ALJ found that their container
loading and unloading are performed "pursuant to a reallocation of work
from the piers to off[-pier] facilities created virtually in its entirety by the
development of containerization." 266 N. L. R. B., at 254. The ALJ
consequently declared the Rules entirely valid as applied to preserve con-
tainer work destined for consolidators. *Ibid.* The consolidators' charges
were dismissed, as were the charges of one warehouser, Hill Creek Farms,
found not to be engaged in "traditional" warehousing. *Id.*, at 268–269.

because his analysis "appear[ed] to conflict" with the direction in *ILA I* to focus on the work of longshoremen, not offpier laborers. 266 N. L. R. B., at 236–237.

> "By focusing on the economic character of the trucking and warehousing industry and on the work historically performed by trucking and warehousing employees, the [ALJ's] . . . findings give undue emphasis to the work historically performed by trucking and warehousing employees and to the fact that this work was not created by containerization." *Ibid.*

Nevertheless, the Board held the Rules unlawful "as applied to 'shortstopping' and 'traditional' warehousing practices." *Id.*, at 236. The Board reasoned that some cargo loading and unloading work required to be performed by longshoremen under the Rules would unnecessarily duplicate the similar work done by "shortstopping" truckers and "traditional" warehousers. Because cargo in containers can now be moved directly to and from warehouses and trucking terminals without loading or unloading at the pier, the necessity for such longshore labor has been removed, while "traditional" warehousers and "shortstopping" truckers must still do some container loading and unloading at their facilities. Thus, the Board concluded, the loading and unloading work of the longshoremen "no longer exists as a step in the cargo handling process" and "essentially was eliminated" in these two contexts. *Id.*, at 237. Because the Rules seek to preserve this "eliminated" work, the Board concluded that they have "an illegal work acquisition objective" as applied. *Ibid.*

The Court of Appeals for the Fourth Circuit affirmed the Board's general validation of the Rules, concluding that the Board's crucial dual findings—that the shipping companies have the "right to control" container work, and that the Rules had a bona fide work preservation objective—were supported by substantial evidence. *American Trucking Assns., Inc.* v. *NLRB*, 734 F. 2d 966, 977–978 (1984). For

two reasons, however, the Court of Appeals refused to enforce the Board's decision that the Rules constitute unlawful secondary activity when applied to containers destined for "shortstopping" truckers and "traditional" warehousers.

First, in concluding that a partial objective of the Rules is "work acquisition," the Board had failed to make any factual finding that the Rules actually operate to deprive "shortstopping" truckers or "traditional" warehousers of any work. *Id.*, at 979. Second, the Court of Appeals concluded that, as a matter of law, an agreement that preserves duplicative or technologically "eliminated" work simply does not constitute "work acquisition." *National Woodwork* had approved as lawful primary activity a collective-bargaining agreement whose objective was "protection of union members from a diminution of work flowing from changes in technology." 386 U. S., at 648 (Harlan, J., concurring). The ALJ and the Board both had found that the same work-preserving purpose underlies the Rules on Containers. The Rules do not "in any way prevent the identical off-pier work," and although such work may be economically inefficient, "it is not our function as a court of review to weigh the economic cost of the Rules." 734 F. 2d, at 979. The Court of Appeals therefore concluded that "the Rules are lawful in their entirety and may be enforced." *Id.*, at 980.

Although a number of the charging parties sought review of the Fourth Circuit's decision, we granted only the Board's petition for certiorari, 469 U. S. 1188 (1985), thereby limiting our inquiry to the alleged unlawfulness of the Rules with regard to "shortstopping" truckers and "traditional" warehousers.

## II

### A

We have labored in the past to determine Congress' will as expressed in §§ 8(b)(4)(B) and 8(e)—this case requires no new development. In light of the Board's factual findings,

we believe the Court of Appeals' conclusion that the Rules do not violate these provisions, flows as a matter of course from *National Woodwork* and *ILA I*.[12]

In *National Woodwork*, after reviewing in detail the relevant legislative and judicial history, we concluded that "Congress meant that both § 8(e) and § 8(b)(4)(B) reach only secondary pressures." 386 U. S., at 638; accord, *Houston Contractors Assn.* v. *NLRB*, 386 U. S. 664, 668 (1967).[13] In this regard, the prohibitory scope of § 8(e) was found to be no broader than that of § 8(b)(4)(B). 386 U. S., at 635, 638. The purpose of § 8(e) had been to close a "loophole" in the labor laws that allowed unions to employ "hot cargo" agree-

---

[12] The dissent apparently agrees with this assessment of our precedents, as its criticisms are directed largely at the rationales of *National Woodwork* and *ILA I*. See *post*, at 88–90. The rationale of our third major precedent in this area, *NLRB* v. *Pipefitters*, 429 U. S. 507 (1977), is not directly implicated in this case. *Pipefitters* held that activity taken to enforce a valid work preservation agreement will violate § 8(b)(4)(B) if the primary employer "does not have control over the assignment of the work sought by the union." *Id.*, at 510–511. In this case, the ALJ, Board, and Court of Appeals have unanimously concluded that the longshoremen's employers, marine shipping companies, have the "right to control" container loading and unloading work by virtue of their ownership or leasing control of the containers. See 734 F. 2d, at 978; 266 N. L. R. B., at 234, 260–267. Thus the *Pipefitters* test is satisfied here.

[13] Our review in *National Woodwork* extended back to § 20 of the Clayton Act of 1914, 38 Stat. 738, and the decisions in *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443 (1921), and *Bedford Cut Stone Co.* v. *Stone Cutters*, 274 U. S. 37 (1927), which had held that § 20 immunized from the antitrust laws only those union activities "directed against an employer by his own employees." 386 U. S., at 621. We determined that Congress' intent in enacting the Taft-Hartley Act in 1947, 61 Stat. 136, and the Landrum-Griffin Amendments in 1959, 73 Stat. 519, which contained § 8(b) (4)(B) and § 8(e), respectively, had been to maintain this early distinction between primary and secondary union activity. 386 U. S., at 620–638. Today's dissent cites no new legislative history or other evidence to the contrary. See *post*, at 88; see also *post*, at 90–91 (§ 8(e) cannot be read literally, "because many labor-management 'agreements' will entail some secondary effects").

ments to pressure neutral employers not to handle nonunion goods. *Id.*, at 634–637; see *Carpenters* v. *NLRB*, 357 U. S. 93 (1958) *(Sand Door)*. However, we concluded, "Congress in enacting § 8(e) had no thought of prohibiting agreements directed to work preservation." 386 U. S., at 640.[14] Such agreements "are not used as a sword" to achieve secondary objectives, but as "a shield carried solely to preserve the members' jobs." *Id.*, at 630. Because the labor laws do not prohibit bona fide primary activity, we stated that the central inquiry for evaluating claims of work preservation is

> "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the primary employer's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. . . . The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis à vis* his own employees." *Id.*, at 644–645.

We expressly noted that a different case might be presented if a union engaged in activity "to reach out to monopolize jobs

---

[14] Specifically at issue in *National Woodwork* was an agreement between a general contractor and its carpenters' union that union workers would not handle prefabricated doors. Carpenters had traditionally cut and installed blank doors at the jobsite, and the will-not-handle clause had been bargained for with the objective of preserving that work in the face of more efficient off-site technology. The record in *National Woodwork* indicated that it took a machine eight minutes to finish a door with on-site installation requiring only a few more minutes, while a carpenter at the jobsite would take over an hour to perform the same work. Brief for Petitioners in *National Woodwork Manufacturers Assn.* v. *NLRB*, O. T. 1966, No. 110, p. 5, n. 4. Unfair labor charges were filed by suppliers of the prefabricated doors, who claimed that the will-not-handle agreement was unlawfully secondary because it caused the contractor to cancel his business with the suppliers. We upheld the agreement and its enforcement, however, as lawful primary activity engaged in to preserve the carpenters' work. 386 U. S., at 645–646.

or acquire new job tasks *when their own jobs are not threat-ened . . . ." Id.*, at 630–631 (emphasis added).[15]

We reaffirmed the *National Woodwork* analysis in *ILA I*, and noted that "a lawful work preservation agreement must pass two tests": the objective of the agreement must be preservation of work for members of the union rather than some secondary goal, and the "right of control" test of *NLRB* v. *Pipefitters*, 429 U. S. 507 (1977), must be satisfied. 447 U. S., at 504.[16] We ruled, however, that the Board had

---

[15] On this basis (the absence of a threat to union members' jobs) we distinguished boycotts of the type described in *Allen Bradley Co.* v. *Electrical Workers*, 325 U. S. 797 (1945), which the congressional sponsors of § 8(b)(4)(B) had sought to prohibit. In *Allen Bradley*, unionized employees of New York City electrical contractors had agreed with their local employers to boycott electrical equipment manufactured outside the city, in an effort "to secure benefits" for unionized employees of a *different* group of employers, the local electrical equipment manufacturers. 386 U. S., at 628–629; see 325 U. S., at 799–800. The union's agreement in *Allen Bradley* "was not in pursuance of any objective relating to pressuring their employers in the matter of *their* wages, hours, and working conditions; there was no work preservation or other primary objective" involved. 386 U. S., at 629 (emphasis in original). In this sense, the activity was purely acquisitive, indicating an unlawful secondary objective. Cf. *Pipefitters, supra*, at 528–530, n. 16 (condemning union attempts "not to preserve, but to aggrandize" its position); see Lesnick, Job Security and Secondary Boycotts: the Reach of NLRA §§ 8(b)(4) and 8(e), 113 U. Pa. L. Rev. 1000, 1017–1018 (1965).

[16] *Pipefitters* also reaffirmed the basic premises of *National Woodwork*, noting that so long as the "right to control" test is satisfied, it will not normally violate § 8(b)(4)(B) to engage in activity against one's own employer "for the purpose of preserving work traditionally performed by union members even though in order to comply with the union's demand the employer would have to cease doing business with another employer." 429 U. S., at 510. See n. 12, *supra*. *Pipefitters* involved a refusal by union steamfitters to install equipment containing factory-installed piping specified by the general contractor, based on the unit's agreement with its employer, a subcontractor on the job, not to handle such equipment. Because the subcontractor did not have the right to control equipment specifications for the job, the union's refusal was found to violate § 8(b)(4)(B). 429 U. S., at 511–513, 528–531.

erred as an initial matter by defining the "work in dispute" as "off-pier" container loading and unloading. *Id.*, at 506. Because technological innovation may significantly change the character of an industry, work preservation agreements negotiated to address such change "typically come into being when employees' traditional work is displaced." *Id.*, at 505. Consequently, the place where work is to be done often lies at the heart of the controversy, and is seldom relevant to the definition of the work itself. See *id.*, at 506–507.[17] The Board's focus on the container work performed off-pier by nonlongshoremen was erroneous because it ignored the question whether "the parties have tailored their agreement to the objective of preserving the essence of the traditional work patterns," *id.*, at 510, n. 24, and "foreclosed—by definition—any possibility that the longshoremen could negotiate an agreement to permit them to continue to play any part in the loading or unloading of containerized cargo." *Id.*, at 508.

*ILA I* concluded, however, that collective-bargaining agreements designed to "accommodate change" while still preserving some type of work for union members may nevertheless be lawful primary agreements; the work preservation doctrine does not require that unions block progress by refusing to permit any use at all of new technology in order to avoid the prohibitions of §§ 8(b)(4)(B) and 8(e). *Id.*, at 506. The inquiry is whether "the objective of the agreement was work preservation rather than the satisfaction of union goals elsewhere," *id.*, at 510, and the analytical focus must be "on the work of the bargaining unit employees, not on the work of

---

[17] Thus the definition of the work in dispute under the Rules on Containers used by the Board on remand was simply "the work of loading and unloading containers." 266 N. L. R. B., at 237. Although the Board also stated a precise description of the work claimed by the Rules—"the initial loading and unloading of cargo within 50 miles of a port into and out of containers owned or leased by shipping lines having a collective bargaining relationship with the ILA," *id.*, at 236—the less complex definition more accurately describes the *work* in controversy as opposed to the precise means used to secure it in the collective-bargaining agreement at issue.

other employees . . . doing the same or similar work." *Id.*, at 507. "The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant . . . so long as the union had no forbidden secondary purpose." *Id.*, at 507, n. 22.[18]

Because the Board's analysis had proceeded from an erroneous premise, we remanded. We directed the Board to examine "how the contracting parties sought to preserve . . . work, to the extent possible, in the face of" containerization, and "to evaluate the relationship between traditional longshore work and the work which the Rules attempt to assign to ILA members." *Id.*, at 509. If, on remand, the Rules were found to be a bona fide attempt to preserve longshore work, rather than an effort "'tactically calculated to satisfy union objectives elsewhere,'" then the Rules would be valid. *Id.*, at 511, quoting *National Woodwork*, 386 U. S., at 644. "[T]he question is not whether the Rules represent the most rational or efficient response to innovation, but whether they are a legally permissible effort to preserve jobs." 447 U. S., at 511.

## B

We accept the Board's factual findings as supported by substantial evidence, *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474 (1951), and are mindful of the rule that the Board's construction of the Act is due our deference. See, *e. g., Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 500–501 (1978); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963). We are in agreement with the Board's basic statutory conclusions: §§ 8(b)(4)(B) and 8(e) prohibit secondary, but not

---

[18] Cf. *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 614 (1980) ("As long as secondary picketing only discourages consumption of a struck product, incidental injury to the neutral is a natural consequence of an effective primary boycott"); *NLRB* v. *Operating Engineers*, 400 U. S. 297, 303–304 (1971) ("primary activity is protected even though it may seriously affect neutral third parties" because "[s]ome disruption of business relationships is the necessary consequence of the purest form of primary activity").

primary, union activity, and bona fide work preservation agreements and their enforcement may constitute protected primary goals. Now that the Board has fully developed the factual record regarding the Rules, the only question presented is whether, as a matter of law, the Board applied the "work preservation" doctrine consistently with our prior cases.

In our view, the Board committed two fundamental errors. First, by focusing on the effect that the Rules may have on "shortstopping" truckers and "traditional" warehousers, the Board contravened our direction that such extra-unit effects, "no matter how severe," are "irrelevant" to the analysis. 447 U. S., at 507, n. 22. "So long as the union had no forbidden secondary purpose" to disrupt the business relations of a neutral employer, *ibid.*, such effects are "incidental to primary activity." *Pipefitters*, 429 U. S., at 526. Here the ALJ, Board, and Court of Appeals all have agreed that the Rules were motivated entirely by the longshoremen's understandable desire to preserve jobs against "the steadily dwindling volume" of cargo work at the pier. 734 F. 2d, at 978. Given this clear primary objective to preserve work in the face of a threat to jobs, extra-unit effects of a work preservation agreement alone provide an insufficient basis for concluding that the agreement has an unlawful secondary objective. Absent some additional showing of an attempt "to reach out to monopolize jobs," *National Woodwork, supra,* at 630, that is, proof of an attempt "not to preserve, but to aggrandize," *Pipefitters, supra,* at 528–530, n. 16, such an agreement is lawful.[19]

---

[19] *Amicus* AFL–CIO suggests that any distinction between "work preservation" and "work acquisition" in this area distorts the primary/secondary inquiry under §§ 8(b)(4)(B) and 8(e) and "virtually defies principled application in a situation in which technological advances have altered the nature of the work to be performed." Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 2–3. However, while we acknowledge that the dichotomy may be susceptible to wooden application, we are not prepared to abandon it. The "acquisition"

Second, we believe the Board misconstrued our cases in suggesting that "eliminated" work can never be the object of a work preservation agreement. Technological innovation will often by design eliminate some aspect of an industry's work. For example, in *National Woodwork* the agreement at issue strove to preserve carpentry work done by hand at the jobsite, even though new off-site machining techniques had eliminated the necessity for much of this work. Yet the jobs of carpenters were no less threatened, nor was their attempt to preserve them any less primary, than if the contractor had decided to subcontract the cutting and fitting of doors to nonunion workers. Cf. *Fibreboard Corp.* v. *NLRB*, 379 U. S. 203, 209 (1964). Similarly, containers have eliminated some of the work of loading and unloading cargo by hand for all participants in the industry—longshoremen, truckers, and warehousers alike.[20] "Elimination" of work

---

concept in the work preservation area originated in *National Woodwork*, where we distinguished *Allen Bradley*, 325 U. S. 797 (1945), as involving "a boycott to reach out to monopolize jobs or acquire new job tasks *when [union members'] own jobs are not threatened.*" 386 U. S., at 630–631 (emphasis added); see n. 15, *supra.* An agreement bargained for with the objective of work preservation in the face of a genuine job threat, however, is not "acquisitive" in the sense that concept was used in *National Woodwork*, even though it may have the incidental effect of displacing work that otherwise might be done elsewhere or not be done at all. See *Pipefitters*, 429 U. S., at 510, 526, 528–529, n. 16. Yet as the facts of *Allen Bradley* demonstrate, an agreement that reserves work for union members may also have an unlawful secondary objective. The preservation/acquisition dichotomy, when employed with the *Allen Bradley* distinction firmly in mind, can serve the useful purpose of aiding the inquiry regarding unlawful secondary objectives when an agreement attempts to secure work but "jobs are not threatened."

[20] See, *e. g.*, 266 N. L. R. B., at 255 ("With the introduction of containers, the off[-pier] [truck]drivers and their helpers . . . lost work themselves in connection with truckloading operations at pierside. In addition, dockworkers employed at trucking stations by motor carriers, after containerization, lost work in connection with FSL containers delivered directly over the road to warehouses, consignees, or interlining trucking stations . . .").

in the sense that it is made unnecessary by innovation is not of itself a reason to condemn work preservation agreements under §§ 8(b)(4)(B) and 8(e); to the contrary, such elimination provides the very premise for such agreements.

It must not be forgotten that the relevant inquiry under §§ 8(b)(4)(B) and 8(e) is whether a union's activity is primary or secondary—that is, whether the union's efforts are directed at its own employer on a topic affecting employees' wages, hours, or working conditions that the employer can control, or, instead, are directed at affecting the business relations of neutral employers and are "tactically calculated" to achieve union objectives outside the primary employer-employee relationship. See *National Woodwork*, 386 U. S., at 644–645; *Pipefitters*, 429 U. S., at 528–529, and n. 16. The various linguistic formulae and evidentiary mechanisms we have employed to describe the primary/secondary distinction are not talismanic nor can they substitute for analysis. See generally *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 386–390 (1969). The inquiry is often an inferential and fact-based one, at times requiring the drawing of lines "more nice than obvious." *Electrical Workers* v. *NLRB*, 366 U. S. 667, 674 (1961); see *Pipefitters*, *supra*, at 531 ("commonsense inference"). In this case, however, the ALJ, Board, and Court of Appeals all found that the ILA negotiated the Rules on Containers with the sole object of preserving work for its members and that there is no evidence of "any significant ILA interest in the labor relations of the class of employers boycotted by the Rules." 266 N. L. R. B., at 249. Furthermore, as the Fourth Circuit noted, this is not a case in which an avowed work preservation agreement "seeks to claim work so different from that traditionally performed by the bargaining unit employees" that a secondary objective might be inferred. 734 F. 2d, at 980.[21] When the objective of an agreement and its enforce-

---

[21] There is no disagreement among the factfinders that the loading and unloading of containers is the "functional equivalent" of the traditional

ment is so clearly one of work preservation, the lawfulness of the agreement under §§ 8(b)(4)(B) and 8(e) is secure absent some other evidence of secondary purpose.

In sum, we believe that the Board correctly identified as erroneous the ALJ's focus on the effect of the Rules on the work of employees outside the bargaining unit, but then fell into the same analytical trap. The crucial findings are that the ILA's objective consistently has been to preserve long-shore work, and that the ILA's employers have the power to control assignment of that work. *ILA I*, 447 U. S., at 504. In light of these facts, further inquiry into the effects of the Rules as applied was inconsistent with our precedents in this concededly difficult area.

## C

In *ILA I* it was argued that the Rules preserve work made "utterly useless" by containerization and thus are "nothing less than an invidious form of 'featherbedding' to block full implementation of modern technological progress." *Id.*, at 526–527 (BURGER, C. J., dissenting). Similar arguments are repeated today, see *post*, at 89, 90, and were presented in *National Woodwork* as well. See 386 U. S., at 644. Our response is no different than it was 18 years ago: "Those arguments are addressed to the wrong branch of government." *Ibid.*[22] Justice Harlan wrote separately in *National Woodwork* to underscore the Court's reasoning on this point:

___

work of longshoremen, that is, handling cargo going onto or coming from a ship, *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249, 270 (1977); 266 N. L. R. B., at 237, and that this work is entirely separable from other aspects of container handling. *Id.*, at 234.

[22] It should also be noted that the same Congress that wrote § 8(b)(4)(B) enacted a separate "antifeatherbedding" provision. Section 8(b)(6) of the Act makes it an unfair labor practice for a union "to . . . cause an employer to pay . . . any money . . . for services which are not performed or not to be performed." 29 U. S. C. § 158(b)(6). We have noted that this provision is a "narrow prohibition," *Scofield* v. *NLRB*, 394 U. S. 423, 434 (1969), that does not prohibit payment for work actually done or offered, even if that work might be viewed as unnecessary or inefficient. *NLRB* v. *Gam-*

"The only question thus to be decided . . . is whether Congress meant, in enacting §§ 8(b)(4)(B) and 8(e) of the National Labor Relations Act, to prevent this kind of labor-management arrangement designed to forestall possible adverse effects upon workers arising from changing technology.

.            .            .            .            .

"[B]oth sides of today's division in the Court agree that we must be especially careful to eschew a resolution of the issue according to our own economic ideas and to find one in what Congress has done.

.            .            .            .            .

"In view of Congress' deep commitment to the resolution of matters of vital importance to management and labor through the collective bargaining process, and its recognition of the boycott as a legitimate weapon in that process, it would be unfortunate were this Court to attribute to Congress, on the basis of such an opaque legislative record, a purpose to outlaw the kind of collective bargaining and conduct involved in these cases. Especially at a time when Congress is continuing to explore methods for meeting the economic problems increasingly arising in this technological age from scientific advances, this Court should not take such a step until Congress has made unmistakably clear that it wishes wholly to exclude collective bargaining as one avenue of approach to solu-

---

*ble Enterprises, Inc.*, 345 U. S. 117, 123–124 (1953); *American Newspaper Publishers Assn.* v. *NLRB*, 345 U. S. 100, 104–106 (1953); see 93 Cong. Rec. 6441 (1947) (remarks of Sen. Taft) (§ 8(b)(6) not intended "to give to a board or a court the power to say that so many men are all right, and so many men are too many"). Because the Rules seek to preserve the actual work of loading and unloading containers at the pier, they do not constitute "featherbedding" that Congress has seen fit to prohibit. "If the company wants to require more work of its employees, let it strike a better bargain. The labor laws as presently drawn will not do so for it." *Scofield, supra,* at 434.

tions in this elusive aspect of our economy." *Id.*, at 648–650.

Congress has not altered the provisions at issue in the 18 years since *National Woodwork* was decided, nor has any new evidence been offered regarding Congress' original intent. In the meantime, management and labor alike have relied on the work preservation doctrine to guide their bargaining. In such circumstances we should follow the normal presumption of *stare decisis* in cases of statutory interpretation. See *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736–737 (1977); *Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974).

### III

Under the Rules on Containers, the ILA has given up some 80% of all containerized cargo work and the technological "container revolution" has secured its position in the industry. We have often noted that a basic premise of the labor laws is that "collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole." *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666, 678 (1981). The Rules represent a negotiated compromise of a volatile problem bearing directly on the well-being of our national economy. We concur with the ALJ, Board, and Court of Appeals that the Rules on Containers are a lawful work preservation agreement. Nothing in this record supports a conclusion that their enforcement has had a secondary, rather than primary, objective. The judgment below is therefore

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

It is not surprising that neither the opinion of the Court today, nor the body of the opinion in *NLRB* v. *Longshoremen*, 447 U. S. 490 (1980) *(ILA I)*, contains the text of the

Rules that the Court is called upon to consider. Nor is it surprising that §§ 8(b)(4)(B) and 8(e) of the National Labor Relations Act are not set out in full in the body of those two opinions. For if one were to set the provisions of the Rules side by side with the provisions of the Act one could not help but conclude that the Rules are proscribed by those sections. It is only by stringing together a series of highly questionable propositions that the Court has arrived at the contrary result. In my view, Congress did not intend the union activities at issue to be sanctioned by the National Labor Relations Act.

The Rules on Containers, an agreement entered into between various shipowners and the International Longshoremen's Association (ILA), begin by proclaiming their intent to "preserve the work jurisdiction of longshoremen and all other ILA crafts . . . ." They move on to define certain classes of containers which "shall be loaded or discharged . . . at a waterfront facility by deepsea ILA labor." Among the containers which must be so handled are those described by Rule 1(a)(3)—"[c]ontainers designated for a single consignee from which the cargo is discharged (deconsolidated) by other than its own employees," provided that such unloading takes place within 50 miles of the port and that the cargo is not warehoused for more than 30 days. If the containers are first unloaded more than 50 miles from the port then they need not be unloaded by ILA labor.

Rule 7 sets forth sanctions to be imposed on employers and any other entity violating the Rules. Each time a container passes over the pier in violation of the Rules the shipping employer pays the union $1,000 in "liquidated damages"; in addition, Rule 7(d) states that both the employer and the ILA will cease doing business with "[a]ny facility operated in violation of the Container Rules."

The effect of these Rules is well illustrated by their application to the trucking practice known as "shortstopping"— one of the classes of work with respect to which the Board found the Rules to be work acquisitive. Prior to contain-

erization, longshoremen unloaded cargo breakbulk from the ship and moved it to trucks for inland transport. Despite the fact that the trucks already had been loaded at the pier, truckers often stopped at nearby trucking terminals, where the trucks were unloaded and again carefully reloaded so as to meet gross weight and weight distribution requirements for long distance carrying. This practice is known as "short-stopping," and it is quite clearly related to the needs of the trucking, not the shipping, business.

After containerization there was no longer a need for ILA unloading at the pier. The containers could be lifted directly from the ship's hold and placed on a truck chassis. Nevertheless, the trucks might still be "shortstopped" for the same reasons as before. What the Rules — in this case Rule 1(a)(3) — do is to require that the containers be unloaded by ILA labor at the pier despite the fact that such unloading is now completely unnecessary. If the containers are subsequently shortstopped, unloading and loading which need be done only once is instead done twice. The result is that the principal advantage of containerization—that the cargo need not be handled breakbulk at the pier—is lost. And if the truckers shortstop a container that has not been unloaded by the ILA, they are subject to Rule 7 sanctions, including the refusal of the shippers to supply the truckers with containers.

Section 8(b) of the National Labor Relations Act provides, in pertinent part:

> "It shall be an unfair labor practice for a labor organization or its agents —
>
> .        .        .        .        .
>
> "(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce where in either case an object thereof is —
>
> .        .        .        .        .
>
> "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or

manufacturer, or to cease doing business with any other person . . . *Provided,* [t]hat nothing contained in this clause (B) shall be construed to make unlawful, when not otherwise unlawful, any primary strike or primary picketing. . . ."

Section 8(e) of the National Labor Relations Act similarly states:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void. . . ."

It should be evident that the Rules violate the plain language of § 8(e). The Rules constitute an "agreement" between an employer and a labor organization "whereby [the] employer . . . agrees . . . to cease doing business with any other person. . . ." That is the import of Rule 7(d). Nor can it be doubted on the facts here that the union has transgressed the plain language of § 8(b)(4)(B) by seeking to enforce the agreement through coercing the shipowners to stop providing containers to certain entities that were violating the Rules. As a matter of plain language, one would not think that the union's actions here fell within the statutory exception for "primary strikes or primary picketing." Finally, I think it fairly obvious why Congress would seek to prohibit such activity by labor unions. As illustrated by this very case, absent such restrictions unions are free to exercise their considerable power, through concerted action, to manipulate the allocation of resources in our economy—even to the point where in the name of "work preservation" a union could literally halt technological advance.

One might well ask, then, how §§ 8(e) and 8(b)(4)(B) have been construed so as not to preclude the actions at issue here. It has not been a simple process. Beginning with *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612 (1967), this Court explained its understanding that the exception in § 8(b)(4)(B) for "primary strikes or primary picketing" indicated that Congress only intended to preclude "secondary activity" under that section. Then, relying only on the ambiguous legislative history of § 8(e), the Court concluded that that section also was intended to preclude only "secondary" activity. Admittedly, at least with respect to § 8(b)(4)(B) this distinction has some support in the language of the statute, and even has some usefulness despite the fact that, as the Court recognizes, *ante,* at 81, the primary/secondary distinction is perhaps one of the gauziest of legal concepts. But assuming that Congress did not intend § 8(e) to extend to certain kinds of agreements that could be described as "primary," it does not follow from that concession that "work preservation" is one of the "primary" activities that the statutes do not prohibit.

Yet that is the conclusion that the Court reached in *National Woodwork,* and the work preservation/work acquisition distinction provides the basis for the conclusion the Court reaches today. As refined by the Court, it now appears that, at least where a particular union's jobs are "threatened," an agreement will be considered valid so long as the union's subjective intent is to preserve union jobs and the union conducts its bargaining with an employer who has "control" over those jobs; it is only where the agreement is "tactically calculated to satisfy union objectives elsewhere," *ante,* at 78, that the agreement will be considered work acquisitive. In applying this test, we are told first that we must look to "'all the surrounding circumstances,'" *ante,* at 75 (quoting *National Woodwork*), to determine whether the union's objective was work preservation, or the acquisition

of work traditionally done by others. In almost the same breath, however, we are told that here the Board committed fundamental error by "focusing on the effect that the Rules may have on 'shortstopping' truckers and 'traditional' warehousers," because such "extra-unit effects" are "'irrelevant' to the analysis." *Ante*, at 79 (quoting *ILA I*).

These directives appear contradictory, for it would seem difficult indeed to determine whether a particular agreement is "work acquisitive" without focusing, to some degree, on the work that is being acquired. It may be that the Court today ultimately resolves this problem by establishing that the only test is whether the union subjectively intended to do more than preserve work it had always done, but if so I cannot agree that the test accurately separates "primary" from "secondary" activity, nor can I agree that the resulting test comports with Congress' intent in enacting §§ 8(b)(4)(B) and 8(e).

As to the relationship between the Court's test and Congress' intent, I note that today the Court forthrightly admits that a "work preservation" agreement will not be illegal despite the fact that its intent is to preserve work that has been entirely "eliminated" by technological change. As noted previously, such agreements can result in "preserving" work merely by requiring duplication, thereby forcing an employer to pay for labor that no longer has an economic use. Indeed, one of the reasons stated by the Court of Appeals for the Fourth Circuit for *upholding* the Rules as applied to "shortstopping" was that, given that under the Rules ILA labor would have to unload at the pier any container that was going to be shortstopped, there still was no indication in the record that the ILA had "acquired" any work, because there was no indication that the containers would not be shortstopped in any event when they reached the trucking terminal. *American Trucking Assns., Inc.* v. *NLRB*, 734 F. 2d 966, 979 (1984). As THE CHIEF JUSTICE noted in his dissent in *ILA*

*I*, the upshot of allowing unions to enter into such agreements is that they may render change so difficult, by artificially raising the costs of a new system, that they stifle technological advance. *ILA I*, 447 U. S., at 526–527 (BURGER, C. J., dissenting). It is hard to believe that the Congress which enacted a statute that by its plain terms would have prohibited such agreements nevertheless intended to sanction agreements requiring such make-work.

It is no answer to these objections that Congress intended the collective-bargaining process to take care of the various economic problems raised by union work preservation agreements such as those at issue. It is true that Congress established collective bargaining as the primary tool for resolving most labor disputes. But if private ordering were sufficient to alleviate all labor problems then there would be no need for labor laws. Instead, Congress enacted comprehensive labor legislation for the "establishment and maintenance of industrial peace to preserve the flow of interstate commerce." *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666, 674 (1981). Obviously, in enacting §§ 8(b)(4)(B) and 8(e) Congress identified certain union conduct which should be prohibited whether or not the underlying dispute could be resolved through collective bargaining. With respect to these sections Congress targeted union activity which raised restraints on trade that, if not prohibited by the antitrust laws, must be addressed by other means. See *National Woodwork*, 386 U. S., at 656–657 (Stewart, J., dissenting).

A decent regard for *stare decisis* suggests that battle be not again joined on the question decided in *National Woodwork*, but to me the dubious correctness of that decision indicates that the Court should not expand it beyond its facts, and should now try to move in the direction of the plain language of the statutes in those cases not clearly covered by *National Woodwork*. I can agree that § 8(e) cannot be read

with a slavish literalism, because many labor-management "agreements" will entail some secondary effects on the employer's business relations that Congress would not have intended to proscribe. Similarly, I can concede that many "agreements" motivated by a desire for "work preservation" are lawful under the NLRA. Thus, a union faced with loss of jobs might agree to a pay cut to preserve the work of its members. But for me there is a difference between such "primary" activity and an agreement that an employer will refrain from doing business with a third party so that a union may retain its jobs. Through such agreements a union can extend its influence beyond the unit employer and the traditional bargaining issues of wages, hours, and working conditions, and expand the labor dispute to those "neutral" employers who participate in the employer's markets. In the context of technological change, the union's agreement may put the third party out of business before it ever begins. That is the "secondary" activity with which Congress was concerned.

The primary/secondary distinction is not, of course, capable of precise application. The classic "secondary" activity, whereby a union that has a dispute with employer A exerts economic pressure on employer B to further its goals with respect to employer A, is not really present in this case. Here the union's direct contact has been with the primary employers, the shipowners. But as noted previously, there is little reason to believe that in enacting §§ 8(b)(4)(B) and 8(e) Congress intended to prevent only this type of influencing of secondary employers. Moreover, even meeting the Court on its own terms and applying its formulation of "secondary" activity, I believe that as applied to "shortstopping" and traditional warehouse work the Rules have an unlawful secondary objective.

There is no dispute that "shortstopping" occurred even when longshoremen regularly unloaded cargo breakbulk from the ships and the cargo was placed into trucks. Similarly,

some ship cargo traditionally was taken to nearby warehouses for storage, awaiting ultimate distribution. As discussed previously, containerization made it possible to take entire truckloads directly from the ship's hold to these warehouses and truck terminals, so that a loading and unloading process that used to take place twice now need be done only once. The Rules ensure that in these circumstances the containers will be unloaded once by ILA labor; it does not take much insight to recognize, therefore, that the natural tendency of the Rules will be to bring the truck terminals and warehouses to the pier, so that to the greatest extent possible the containers will only have to be unloaded once, with the "shortstopping" and warehousing being performed by ILA members. This will be the only means for these trucker and warehouse employers to compete with those who handle containers exempt from the Rules, and who have only the costs of one handling to pass along to their customers.

This scenario convinces me that the Rules constitute illegal secondary activity. Absent the Rules it would have been business as usual for the truckers and warehousemen; with the Rules they are subject to refusals to deal, to possible fines from the shippers who own the containers, and perhaps to difficult decisions concerning the course that their own businesses and employee relations will take. They are the "'unoffending employers'" who have been mulcted in a labor dispute "'not their own.'" *National Woodwork, supra,* at 626–627 (quoting *NLRB* v. *Denver Bldg. Trades Council,* 341 U. S. 675, 692 (1951)). Such pressures are what the statutes were intended to protect against. Moreover, from this standpoint the Rules are work acquisitive; however pure the motives of the union might be the result of the Rules is likely to be that the ILA receives work and the truckers and warehousemen lose it.

The conclusion that the Rules are secondary—and work acquisitive—in the case before us is supported by a look at how the Rules actually are structured with respect to "short-

stopping" and warehousing. For present purposes I accept the Court's suggestion that when containers were first introduced the ILA could simply have boycotted all containers by refusing to unload any of them. It does not follow, however, that because the ILA could legally boycott all containers it therefore can single out which containers it is entitled to unload. Rule 1(a)(3) preserves for the ILA the right to unload any container destined for a single consignee which is unloaded within 50 miles of the port, and which is not unloaded by the employees of an ultimate consignee or warehoused for more than 30 days. The record does not indicate that this Rule applies to work done by any employers other than shortstopping truckers, short-term warehousemen, and "consolidators." Of these, both the truckers and warehousemen performed the unloading task prior to containerization. Given this history it should be clear that at least this part of the Rule must be considered secondary. Failing, for whatever reason, to preclude the advent of containers altogether, and recognizing that containers would eliminate a large portion of their work, the ILA apparently looked around for similar work close enough to the pier to claim as its own. It found it in the work performed by truckers and warehousemen. I can only view Rule 1(a)(3), which is specifically directed at that work, as intentionally work acquisitive.

The Court avoids this conclusion by stating the test as whether the union's objective was to preserve its traditional work, and by pretending to accept the ALJ's and the Board's "findings" that "the ILA's objective consistently has been to preserve longshore work . . . ." *Ante,* at 81–82. I, of course, agree with the Court that the Board's factual findings must be accepted if supported by substantial evidence, and that deference is due to the Board's construction of the Act, *ante,* at 78, but the Board did not make the findings the Court cites. The Board accepted the ALJ's finding that the "ILA had an *overall* work preservation objective in negotiating the Rules," see 266 N. L. R. B. 230, 236 (1983), but

both the Board and the ALJ concluded that as applied to "shortstopping" and some warehousing the Rules were work-acquisitive. Although their rationales were articulated differently, I believe that both bodies were expressing the sentiments expressed above—both the intent and effect of this part of the Rules were to obtain work not traditionally done by longshoremen. In concluding otherwise the Court engages in nothing but a shell game—it hides the ILA's work acquisition under one shell and then forces all attention on the limited question of the union's intent in bargaining with its employer. By broadly defining the work traditionally done by longshoremen and refusing to allow a review of the larger economic scene, the Court manages to turn over only shells representing work preservation. This latest refinement moves even further from the language and intent of §§ 8(b)(4)(B) and 8(e). I would reverse the decision of the Court of Appeals for the Fourth Circuit.