CALIFORNIA CARTAGE
COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Longshoremen's and Ware-
housemen's Union, et al., Pacific Mari-
time Association, Western Conference
of Teamsters and Local Union 692, et
al., Intervenors.

PACIFIC MARITIME
ASSOCIATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Longshoremen's and
Warehousemen's Union, et al.,
Intervenors.

INTERNATIONAL LONGSHOREMEN'S
AND WAREHOUSEMEN'S UNION,
LOCAL 10, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Western Conference of Teamsters and
Local Union 692, et al., Intervenors.

Nos. 86–1135, 86–1176 and 86–1183.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1987.

Decided July 14, 1987.

Thomas Preston Burke, with whom Linda Auerbach Allderdice was on the brief for petitioner, California Cartage Co., in No. 86–1135.

Dennis A. Gladwell for Pacific Maritime Ass'n and Norman Leonard for Intern. Longshoremen's and Warehousemen's Union, with whom Kenneth W. Anderson, J. Kevin Lilly, for Pacific Maritime Ass'n, petitioner in No. 86–1176 and intervenor in No. 86–1135 and Richard S. Zuckerman, for Intern. Longshoremen's and Warehousemen's Union, petitioner in No. 86–1183 and intervenor in Nos. 86–1135 and 86–1176 were on the joint brief. William J. Kilberg also entered an appearance for petitioner/intervenor, Pacific Maritime Ass'n.

John G. Elligers, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Howard E. Perlstein, Supervisory Atty., N.L.R.B. were on the brief for respondent. Barbara Atkins, Atty., N.L.R.B. also entered an appearance for respondent.

Herman L. Wacker, with whom Charles H. Thulin was on the brief for Western Conference of Teamsters, intervenor in Nos. 86–1135, 86–1176 and 86–1183.

Before MIKVA and SILBERMAN, Circuit Judges, and MARKEY,[*] Chief Judge, U.S. Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Seventeen years ago, the Pacific Maritime Association ("PMA"), an association of steamship lines, stevedoring firms and marine terminal operators, and the International Longshoremen's and Warehouse-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

men's Union ("ILWU") signed a supplement to their master collective bargaining agreement ("Supplement") under which PMA agreed that all "stuffing" and "unstuffing" of shipping containers[1] within fifty miles of West Coast ports would be performed only by longshoremen working at container freight stations belonging to PMA.[2] In June, 1971, pursuant to the Supplement, the ILWU instructed longshoremen working at PMA-member stevedoring and terminal operations not to unload or load aboard ships any containers destined for or arriving from the container freight station operated by California Cartage Company, Inc. ("CalCart"). CalCart does not belong to PMA, and employs members of the Teamsters Local 692—not longshoremen.

CalCart filed unfair labor practice charges with the NLRB in 1971, arguing that the PMA–ILWU Supplement was a "hot cargo" agreement in violation of section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1970), and that ILWU attempts to enforce the Supplement constituted a secondary boycott in violation of section 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4) (1970).[3] The Board agreed. In a 1974 decision, the Board held the Supplement was "obviously" illegal insofar as it obligated PMA and the longshoremen to prevent steamship lines that were *not* members of PMA from utilizing other than longshore labor to stuff and unstuff their containers. The Board also concluded the Supplement was illegal with respect to containers of PMA members because stuffing and unstuffing containers was not the traditional work of the ILWU bargaining unit and therefore the Supplement lacked the necessary work preservation objective. *ILWU (California Cartage Co., Inc.)*, 208 NLRB 994 (1974), *aff'd sub nom. PMA v.*

*NLRB*, 515 F.2d 1018 (D.C.Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 347 (1976).

Six years after the Board's decision, the Supreme Court decided a section 8(e) case involving a similar agreement entered into by the East Coast longshoremen's union. *NLRB v. ILA*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980) ("*ILA I*"). Because the Supreme Court's analysis of the work preservation issue in *ILA I* differed fundamentally from the approach the Board had followed in the 1974 ILWU case, we granted a motion by PMA and ILWU to recall our mandate and remand the ILWU case to the Board for reconsideration in light of *ILA I*. On remand, in 1986, the Board held that insofar as the Supplement applied to containers owned or leased by PMA steamship lines, it had a legitimate work preservation objective and was therefore lawful. The Board adhered to its original position, however, that the Supplement violated section 8(e) as it applied to containers owned or leased by non-PMA member steamship lines, and that the ILWU had violated section 8(b)(4) by instructing its members not to handle non-PMA containers. *ILWU*, 278 NLRB No. 20 (1986). PMA and the ILWU both have petitioned us to set aside the portion of that decision finding unfair labor practices. CalCart, on the other hand, filed a separate petition seeking to have the whole Supplement determined illegal under section 8(e). The teamsters intervened in support of CalCart. The Board filed cross-applications to enforce its order. We uphold the Board's decision with respect to PMA containers, but remand the case for a more complete explanation as to why the Supplement is illegal with regard to non-PMA containers.

1. Shipping containers are large portable compartments for holding and transporting freight. A typical container measures 8 by 8 by 30 feet, holds ten tons of cargo, and is specially designed to rest on both a ship and a truck and railroad car. The task of loading cargo into a container is called "stuffing"; the task of emptying a container is called "unstuffing."

2. The Supplement does not cover "shippers' load" containers, which are stuffed or unstuffed on the owner's premises and contain only cargo belonging to that shipper or consignee. Shippers' loads constitute approximately 85 percent of all containers.

3. Additional charges were filed after the original version of the Supplement was amended by a Memorandum of Understanding signed on February 10, 1972.

## I.

The ILWU represents a collective bargaining unit that covers stevedoring firms, marine terminal operators and steamship lines. The Board certified the unit almost fifty years ago, defining it to include all longshoremen who worked on the West Coast for companies that were members of several listed employers associations, including the predecessor of PMA. *Shipowners' Association,* 7 NLRB 1002, 1025 (1938). This bargaining unit was unusual in two respects. First, it included steamship lines even though they generally subcontract all longshore work to stevedoring firms and terminal operators because the steamship lines were "intimately associated with the employment of longshore labor." *Id.* at 1017. Second, the unit encompassed many different employers. It may have been that virtually all direct or indirect employers of longshoremen on the West Coast belonged to the listed associations and thus none fell outside the unit.[4] The Board defined the unit so broadly because of the strength shown by the employers jointly negotiating and administering labor agreements through those associations. *Id.* at 1024.

The ILWU's fifty-year battle to preserve the role of longshoremen on West Coast docks in the face of modernization in the methods of transporting cargo by sea is well documented in the Board's decisions. *See* 208 NLRB at 994–95; 278 NLRB No. 20 at 3–5. Prior to World War II, truckdrivers generally delivered outgoing cargo to docks in separate packages ("break bulk"). Longshoremen would place the individual packages on small wooden platforms ("pallets"), transport the pallets across the dock by forklift, hoist them onto a ship, and thereupon stow them in the ship's hold. The process was reversed for incoming cargo. After the war, when cargo often arrived at the docks already placed on pallets, the ILWU negotiated "make work" collective bargaining agreements that required all packages to be removed from truckers' pallets, placed loose on the floor of the dock, and then reloaded by longshoremen onto longshore pallets. As more powerful hoisting equipment became available, the ILWU negotiated further "make work" contractual provisions that limited the weight that could be lifted on each hoist. In 1960, however, the ILWU reached an agreement with PMA, the Mechanization and Modernization Agreement ("M & M Agreement"), relinquishing the inefficient rehandling requirements and weight limitations in return for employer contributions to pension and unemployment funds and a promise that longshoremen would operate new dockside equipment.

At the time the M & M Agreement was signed, only one steamship serving the West Coast had been fully converted to carry containers. During the subsequent decade, containers swept the industry. Containers could be moved across docks and loaded onto ships more efficiently than pallets, and because containers were much larger, fewer containers were needed to transport the same amount of cargo. These changes, according to the Board, caused a greater loss of longshore work than had been contemplated by the 1960 M & M Agreement. Longshoremen acquired some of the work of stuffing containers, because some cargo continued to be delivered to the docks in individual packages. But most container stuffing and unstuffing work was performed away from the docks—either at container freight stations manned by teamsters, such as the CalCart container freight station, or on the premises of the owner of the cargo. The longshoremen's efforts to take over *all* stuffing and unstuffing of containers (performed within fifty miles of the docks but away from the owners' premises) resulted in the Supplement that is the subject of this case.

## II.

■■■ Section 8(e) of the Act bans contracts "whereby [an] employer ... agrees

---

**4.** Today, some steamship lines belong to PMA (and thus are "included" in the bargaining unit) but some do not. Nothing in the record or briefs suggests whether the reason for this situation is historical or functional, and no party provided an explanation at oral argument.

to ... cease doing business with any other person." 29 U.S.C. § 158(e) (1982). This provision, which is congruent with section 8(b)(4),[5] covers only "secondary" agreements. *NLRB v. International Longshoremen's Ass'n*, 473 U.S. 61, 105 S.Ct. 3045, 3053, 87 L.Ed.2d 47 (1985) ("*ILA II*"); *ILA I*, 447 U.S. at 504, 100 S.Ct. at 2313; *NLRB v. Enterprise Ass'n*, 429 U.S. 507, 517, 97 S.Ct. 891, 897, 51 L.Ed.2d 1 (1977) ("*Pipefitters*"); *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 620, 638, 87 S.Ct. 1250, 1255, 1265, 18 L.Ed.2d 357 (1967). A contract is thought to be secondary if "directed tactically toward a neutral employer in a labor dispute not his own." *National Woodwork*, 386 U.S. at 623, 87 S.Ct. at 1257. If the union's sole objective is to influence the signatory employer's labor relationship with his own employees, the employer clearly is not neutral and the agreement is primary rather than secondary. *ILA II*, 105 S.Ct. at 3057; *ILA I*, 447 U.S. at 504, 100 S.Ct. at 2313; *National Woodwork*, 386 U.S. at 645, 87 S.Ct. at 1268. An agreement to cease doing business is primary, for example, if aimed at preserving work traditionally done by unit employees, *ILA I*, 447 U.S. at 504, 100 S.Ct. at 2313; *Pipefitters*, 429 U.S. at 510, 517, 97 S.Ct. at 897; *National Woodwork*, 386 U.S. at 635, 87 S.Ct. at 1263, or the functional equivalent of that work, *ILA I*, 447 U.S. at 510, 100 S.Ct. at 2316, and intended for its effect on the signatory employer, not others. *Pipefitters*, 429 U.S. at 521–23, 97 S.Ct. at 899–901. But it is secondary if the objective is to acquire completely new jobs, *id.* at 528–31 n. 16, 97 S.Ct. at 903 n. 16, or to benefit other than the signatory employer's employees, *National Woodwork*, 386 U.S. at 645, 87 S.Ct. at 1268. *See also Local 644, United Bhd. of Carpenters v. NLRB*, 533 F.2d 1136, 1147 (D.C.Cir.1975) (expansion of membership in bargaining unit is secondary objective); *Meat & Highway Drivers v. NLRB*, 335 F.2d 709, 716 (D.C.Cir.1964)

(secondary objective to benefit union as a whole rather than members of unit).

■ The Board ultimately decided, as we mentioned, that PMA and the ILWU did not violate section 8(e) by agreeing that PMA-owned or leased containers could be stuffed and unstuffed only by longshoremen. The Supplement was legal as applied to PMA containers because, the Board thought, it was intended to preserve the ILWU unit's traditional work—loading and unloading cargo on and off ships, including "the unitizing of cargo to be shipped and the breaking down of cargo units for delivery"—by securing the functional equivalent of that work, stuffing and unstuffing modern containers.

CalCart and the teamsters do not seriously dispute the evidentiary support for the Board's finding of a functional relationship between consolidating cargo onto pallets and stuffing containers. CalCart notes that some of the work claimed under the Supplement is performed away from the docks—at, for example, CalCart's Wilmington, California container freight station—whereas the longshoremen's traditional work took place exclusively on the docks. But, as is surely clear after *ILA I*, the fact that longshoremen have never previously performed work at the exact same location does not prevent the work sought from being the functional equivalent of work the longshoremen *have* performed. *ILA I*, 447 U.S. at 508–09, 100 S.Ct. at 2315–16. Similarly, CalCart's protest that the effect of the Supplement is to put CalCart "out of business" and give the ILWU a "stranglehold" over the shipping industry is of no significance to the section 8(e) inquiry. *Cf. id.* at 507 n. 22, 100 S.Ct. at 2315 n. 22 ("effect of work preservation agreement on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement....").[6]

---

5. Section 8(b)(4) of the National Labor Relations Act prohibits, *inter alia*, strikes, threats and other forms of coercion aimed, in part or in whole, at forcing an employer "to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(B) (1982).

6. CalCart also argues that stuffing and unstuffing containers cannot be the functional equivalent of the longshoremen's traditional cargo handling work because the agreement contemplates that the stuffing/unstuffing will be performed at *new* container freight stations the

CalCart's principal attack on the Board's decision is directed at the Board's reconstruction of the ILWU's intent in entering into the M & M Agreement and the Supplement. As such, CalCart challenges the Board where perhaps it is strongest before the Court of Appeals; we must affirm the Board if there is substantial evidence to support the Board's finding, *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 691, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951), and we traditionally defer to the Board's factual determination of intent, *see Local Union 1395, IBEW v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir. 1986), where its expertise is clearly employed.

■ The ILWU, CalCart argues, permanently "waived" any claim to container stuffing and unstuffing long before it signed the Supplement. CalCart finds this waiver in the M & M Agreement, which was signed, it will be recalled, in 1960 and extended in 1966. PMA is said to have then purchased from the ILWU all future reductions in longshore work caused by the introduction of new technology such as containers, leaving the ILWU no right to claim the functional equivalent of the eliminated work, for example, container stuffing. The Board rejected this argument, noting that even during the term of the M & M Agreement longshormen performed container stuffing when cargo was delivered to the docks break bulk.[7] In any event, the Board held, the M & M Agreement was not intended to fix for all time the rights of the signatories to deal with the economic consequences of containerization. Rather, upon expiration of the M &

M Agreement, the parties were free to reassess the impact of changing technology and adopt a new approach.

We believe the Board's interpretation of the M & M Agreement is amply supported by evidence. The record indicates that the term "container" does not even appear in the M & M Agreement, and all parties agree that the impact of containerization could not have been fully appreciated in either 1960 or 1966, which suggests the signatories did not intend the Agreement to be the final word on containers. Collective bargaining, moreover, is an ongoing process, and the Board was appropriately reluctant to find in the M & M Agreement an intention to forever freeze aspects of the parties' relationships. *Cf. Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983) (a waiver of collective bargaining rights must be "clear and unmistakable"). Indeed, if a union's acquiescence to the introduction of new technology was easily construed as a permanent abandonment of the union's right to subsequently pursue a different approach, unions would be extremely reluctant to accept any technological innovations in the first place. *Cf. ILA I*, 447 U.S. at 505–506, 100 S.Ct. at 2314.[8]

■ CalCart also claims that the Supplement impermissibly sought union objectives beyond protection of bargaining unit work—even assuming that stuffing and unstuffing could be considered bargaining unit work. The real beneficiaries of the Supplement, according to CalCart, were "terminal warehousemen" who had belonged to a separate ILWU bargaining

---

construction of which will require large expenditures of capital. This contention was not raised before the Board, and therefore is not properly before this court. 29 U.S.C. § 160(e) (1982).

**7.** The Board's 1974 decision was most explicit in this regard, holding that the ILWU bargained away only "make work" rights, such as a claim to perform unnecessary rehandling of cargo. 208 NLRB at 996.

**8.** The teamsters present a broader argument: that even if the longshoremen intended only temporarily to bargain away their claim to tra-

ditional unit work, any subsequent attempt to preserve that work was necessarily secondary. The teamsters suggest that once a claim to traditional work is temporarily waived, the work can never again be characterized as traditional. We find no support, however, for the proposition that all waivers of claims to traditional work are necessarily permanent. *See ILA v. NLRB*, 613 F.2d 890, 910 n. 178 (D.C.Cir.1979), *aff'd*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980) (citing *Meat & Highway Drivers v. NLRB*, 335 F.2d 709, 714 (D.C.Cir.1964)).

unit.[9] The Supplement, as the argument goes, actually created a new bargaining unit for those employees to work at container freight stations (with at least two new job classifications and somewhat different terms than in the master agreement) and therefore must be deemed to have had an objective beyond protection of the primary bargaining unit. To be sure, the Board acknowledged that "the record demonstrates that the predominant source of manpower sent to the newly created stations was nonregistered warehousemen, casuals, and members of other unions," but the Board found that was due to a decline (presumably subsequent to the signing of the Supplement) in the registered longshore workforce. 278 NLRB No. 20 at 9–10 n. 14. Since the work performed at container freight stations was identical to work performed at the dock, and longshoremen could be and were assigned by a central dispatch hall on any given day to work either under the Supplement (at a container freight station) or the master collective bargaining agreement (on the docks), the Board saw the union's objective as protection of bargaining unit employees' interests. And the slight difference between the terms of the two agreements was regarded by the Board as insignificant, especially since some container freight stations actually applied the terms of the master agreement (and not of the Supplement). We think in both respects the Board's finding is easily supportable. That incidental benefits of the union's effort to preserve maximum work opportunities for bargaining unit longshoremen went to others (including non-union members) does not derogate from the union's objective, and the

slight difference in the agreement covering container freight stations, under the circumstances, seems to us irrelevant.[10]

### III.

We think the more difficult question in this case arises out of PMA's and the ILWU's challenge to the Board's adherence, after remand, to the view that the Supplement constitutes a violation of 8(e) insofar as it covers containers owned or leased by non-PMA members. The Board concluded that since PMA, the signatory to the Supplement, had no power to control disposition of the work (stuffing and unstuffing of non-PMA containers), the ILWU dispute, which the Supplement seeks to resolve, is with the non-PMA members, and PMA is a neutral in that dispute. We note that the Board's analysis has an element of artificiality about it. We see no indication of a real dispute between non-PMA members and the ILWU; the former did not even appear before the Board. The Board simply assumed that because those steamship lines are not members of PMA, and typically contract directly with container freight stations to stuff or unstuff their own containers, PMA has no "right of control," see ILA II, 105 S.Ct. at 3054; ILA I, 447 U.S. at 504, 100 S.Ct. at 2313; Pipefitters, 429 U.S. at 521, 97 S.Ct. at 900, over the assignment of that work. According to the Board, the Supplement therefore illegally forces PMA stevedoring companies and marine terminal operators to cease handling containers belonging to nonmembers of PMA and stuffed by non-ILWU labor.

9. In 1968, ILWU Local 13 began representing a bargaining unit composed of terminal warehousemen. See NLRB v. ILWU, Local 13, 549 F.2d 1346, 1350 (9th Cir.1977). These terminal warehousemen, who were not longshoremen, stuffed and unstuffed containers at three PMA-member container freight stations.

10. CalCart's final challenge to the Supplement focuses on the composition of PMA. CalCart argues that any agreement signed by PMA regarding terms of longshore employment is necessarily secondary because PMA membership includes steamship lines and steamship lines, unlike stevedoring firms and terminal opera-

tors, generally do not directly employ longshoremen. The teamsters present the exact opposite argument: that stevedoring firms and terminal operators are the neutrals because only steamship lines decide which container freight station (and thus which union) stuffs and unstuffs containers. Both arguments are at bottom a challenge to the bargaining unit determination made by the Board in 1938. These contentions, however, were rejected by the Board in its 1974 decision and were not reasserted before the Board on remand by any party. The issue therefore has not been properly preserved for our consideration.

**1210**

The record, however, does not clearly disclose as much of an operational difference between members and nonmembers of PMA as the Board's opinion suggests.[11] The PMA's Southern California area manager, John MacEvoy, testified in 1972 that PMA is controlled by a voting procedure based on the tonnage unloaded by PMA-member stevedoring firms from both member and non-member ships, and that at the time the original Supplement was negotiated the stevedoring firms may have acted as proxies casting votes on behalf of the non-member steamship lines. J.A. 1476. He also stated that non-member steamship lines pay PMA (via the stevedoring firms) a tonnage assessment, which is then contributed to a fund set up under the M & M Agreement. J.A. 1477–78. Finally, MacEvoy testified that grievances by longshoremen working under PMA–ILWU collective bargaining agreements can be filed against non-member steamship lines. J.A. 1512–13. This last point, if true, would seem to indicate, contrary to a statement in the NLRB's brief, that non-members of PMA are bound by at least some provisions of contracts negotiated between PMA and the ILWU. It may well be, then, that PMA does indeed have some control over non-PMA members' assignment of work, or that those steamship companies in fact have some control over PMA itself, or both.

In any event, consideration of the formal indicia of control here ought not end the Board's section 8(e) inquiry. The Board must ultimately determine whether the relationship between PMA and the non-PMA steamship companies is such that either can be treated as neutral in a dispute the other has with the ILWU. *See supra* p. 8. We have on several occasions held that the interrelationship between employers can be so close that neither can be regarded as a "neutral" or secondary employer. *See, e.g., Production Workers, Local 707 v. NLRB*, 793 F.2d 323, 333 (D.C.Cir.1986);

*Carpet, Linoleum, Local 419 v. NLRB*, 429 F.2d 747, 752 (D.C.Cir.1970); *Local No. 24, IBT v. NLRB*, 266 F.2d 675, 680 (D.C. Cir.1959). *See also National Woodwork*, 386 U.S. at 627, 87 S.Ct. at 1259 (citing cases holding section 8(b)(4) inapplicable "where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute"). A signatory employer's absence of control over the work sought may reveal that influencing that employer was not the object of the agreement, *see ILA I*, 447 U.S. at 504–05, 100 S.Ct. at 2313–14, but is clearly not the only evidence that can shed light on the relationship between the signatory employer and the one the agreement was intended to influence. Although the Board decides the weight to be assigned the absence of control, *see Pipefitters*, 429 U.S. at 524, 97 S.Ct. at 901, the Supreme Court also made clear in *Pipefitters* that the Board cannot ignore other evidence of the signatory employer's neutrality *vel non*, quoting with approval this statement made by the Board in a previous case:

> The [right of control] test as stated would seem to imply that the Board looked solely at the pressured employer's "contract right to control" the work at issue ... to determine whether that pressure was primary or secondary. In fact, this is not now the Board's approach nor was it ever.
>
> . . . .
>
> ... [O]ur analysis has not [been] nor will it ever be a mechanical one.... [I]f we find that the employer is not truly an "unoffending employer" who merits the Act's protections, we shall find no violation in a union's pressures such as occurred here, even though a purely mechanical or surface look at the case might present an appearance of a parallel situation.

**11.** PMA and the ILWU argue that the Board abused its discretion by failing to reopen the record—subsequent to its 1986 decision—in order to accept an affidavit which, it is said, sheds more light on the relationship between PMA members and non-members. Because of our disposition of the case, we do not decide this issue. It is up to the Board on remand to decide in the first instance whether it would be appropriate to take additional evidence on the member/non-member distinction.

429 U.S. at 523 n. 11, 97 S.Ct. at 901 n. 11 (quoting *George Koch Sons, Inc.,* 201 NLRB 59, 64 (1973)). The Board thus must consider the significance of evidence tending to suggest the signatory employer is not truly neutral.

The Board's opinion does not, in our view, adequately explain those elements in the record that permit the ILWU and PMA to credibly assert that the distinction between member and non-member steamship companies is more formal than real.[12] Since we cannot affirm the Board's deter-

mination of unfair labor practices on this record without a fuller explanation, we remand the case to the Board for that purpose.

*It is so ordered.*

---

12. We recognize that this issue is not unrelated to the definition of the bargaining unit.