*815 LOKEN, Circuit Judge,
with whom SMITH, Chief Judge, WOLLMAN, RILEY, GRUENDER, and SHEPHERD, Circuit Judges, join.
MikLin Enterprises, Inc. (“MikLin”) petitions for review of a National Labor Relations Board (“Board”) Order holding that MikLin violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (“NLRA” or “the Act”), 29 U.S.C. §§ 158(a)(1) and (3), when it (i) discharged and disciplined employees who publicly distributed posters suggesting that Mik-Lin’s “Jimmy John’s” sandwiches posed a health risk to consumers; (ii) solicited employees to aid in removing the posters; (in) encouraged employees to disparage a union supporter; and (iv) removed union literature from in-store bulletin boards. MikLin argues that the Board misapplied governing law and its decision is not supported by substantial evidence. The Board cross-petitions for enforcement of its Order. A divided panel enforced the Order in its entirety. We granted rehearing en banc and vacated the panel decision. We now conclude that the means the disciplined employees used in their poster attack were so disloyal as to exceed their right to engage in concerted activities protected by the NLRA, as construed in a controlling Supreme Court precedent, NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (“Jefferson Standard”). We therefore decline to enforce the determination that MikLin violated the Act by disciplining and discharging those employees and by soliciting removal of the unprotected posters. We enforce the remainder of the Order, as so modified.
I. Background.
A. The “Sick Day Posters” Campaign. MikLin is a family enterprise that owns and operates ten Jimmy John’s sandwich-shop franchises in the Minneapolis-St. Paul area. Michael Mulligan is president and co-owner; Robert Mulligan, his son, is vice-president. In 2007, several MikLin workers began an organizing campaign seeking representation by the Industrial Workers of the World (“IWW”) union. The IWW lost a Board-conducted election in October 2010, filed unfair labor practice charges and objections to the election with the Board, and continued its organizing campaign by urging MikLin to provide employees holiday pay in late 2010. On January 10, 2011, MikLin and the IWW settled the IWW’s objections. MikLin admitted no wrongdoing but agreed to a Board-conducted rerun election if the IWW filed for'the election after sixty days but not later than after eighteen months.
With the holiday season passed,, the IWW decided its next “march on the boss” group action would be to demand paid sick leave. The IWW concluded that the approach of flu season was a good time to raise the issue. At this time, MikLin’s handbook required any employee who would be absent from a shift to find a replacement and notify the store manager. Rule 11 of Jimmy John’s Rules for Employment, which employees received when hired, stated: “Find your own replacement if you are not going to be at work. We do not allow people to simply call in sick! We require our employees and [managers] to find their own replacement! NO EXCEPTIONS!” Failure to follow this procedure resulted in termination. MikLin did not offer paid leave for sick employees, though an employee with sufficient tenure was entitled to paid leave to care for a sick child.
Organizers of the IWW sick leave campaign began their attack in late January *816 and early February 2011 by designing and posting on community bulletin boards in MikLin stores posters that prominently featured two identical images of a Jimmy John’s sandwich. Above the first image were the words, “YOUR SANDWICH MADE BY A HEALTHY JIMMY JOHN’S WORKER.” The text above the second image said, ‘TOUR SANDWICH MADE BY A SICK JIMMY JOHN’S WORKER.” “HEALTHY” and “SICK” were in red letters, larger than the surrounding text in white. Below the pictures, white text asked: “CAN’T TELL THE DIFFERENCE?” The response, in red and slightly smaller: “THAT’S TOO BAD BECAUSE JIMMY JOHN’S WORKERS DON’T GET PAID SICK DAYS. SHOOT, WE CAN’T EVEN CALL IN SICK.” Below, in slightly smaller white text, was the warning, “WE HOPE YOUR IMMUNE SYSTEM IS READY BECAUSE YOU’RE ABOUT TO TAKE THE SANDWICH TEST.” Text at the bottom of the poster asked readers to help the workers win paid sick days by going to their website.
MikLin managers quickly removed the posters from store bulletin boards. On the morning of March 10 — the day before the IWW could request a rerun election— IWW supporters distributed a press release, letter, and the sandwich poster to more than one hundred media contacts, including local newspapers and major news outlets such as the Associated Press, Reuters, Bloomberg, and NBC News. The press release highlighted “unhealthy company behavior.” Its second sentence framed the message: “As flu season continues, the sandwich makers at this 10-store franchise are sick and tired of putting their health and the health of their customers at risk.” The release declared: “According to findings of a union survey, Jimmy John’s workers have reported having to work with strep throat, colds and even the flu.” The release ended with a threat: if Robert and Michael Mulligan would not talk with IWW supporters about their demands for paid sick leave, the supporters would proceed with “dramatic action” by “plastering the city with thousands of Sick Day posters.”
Employees attached to the press release a “sick leave letter” to the Mulligans which asserted that health code violations occur at MikLin stores nearly every day. The employees complained: “By working sick, we are jeopardizing the entirety of [the company’s] image and risking public safety.” The letter accused MikLin of refusing to put customers first, risking customers’ health, and “shoving [customers] to the bottom of the well of importance.” Like the press release, the letter concluded with a threat: if the Mulligans would not meet the employees’ demands, the campaign would “move forward with [its] Sick Day posters by posting them not only in stores, but on the University’s Campus, in hospitals, on street corners, and any other place where postings are common, eitywide.”
Also on March 10, four organizers met with Robert Mulligan. They told Mulligan that MikLin’s attendance policy and low wages pressured employees to work while sick. Mulligan said MikLin was in the process of reforming its policies. The organizers provided Mulligan a printed version of their letter and press release and warned that, unless MikLin took action to fix the sick day policy within ten days, employees would display sandwich posters throughout the area. Employees who attended felt they had achieved some “common ground.”
MikLin posted a new sick leave policy in each store on March 16. The new policy provided a sliding scale of disciplinary points for absences. An employee who did not report but found a replacement would receive no points. An absent employee who *817 could not find a replacement but notified the store manager at least one hour before shift start would receive one point. An absent employee without a replacement who called less than one hour prior to shift start would receive two points. An absent employee who did not call the manager and did not find a replacement would receive three points. An employee who received four disciplinary points within a twelve-month period would be terminated. The policy emphasized: “With regard to absenteeism due to flu like symptoms, Team Members are not allowed to work unless and until those symptoms have subsided for 24 hours.” Between March 10 and March 20, MikLin posted a notice in its stores reminding workers: “[f]or those who ‘don’t feel good’ we have a policy that expects them to find a replacement for their shift.... [T]he record clearly shows that we have demonstrated flexibility with regard to excusing those who cannot find replacements.”
On March 20, IWW supporters implemented their threat to plaster the city with a new version of the Sick Day posters they had placed in MikLin stores in January and February. The bottom of the publicly distributed posters incorporated one change: rather than asking for support of the employees’ request for paid sick leave, the public posters listed Robert Mulligan’s personal telephone number and instructed customers to call him to “LET HIM KNOW YOU WANT HEALTHY WORKERS MAKING YOUR SANDWICH!” A copy of the publicly distributed posters appears as Appendix A to this opinion. Organizers placed posters in various locations near MikLin stores, including lampposts, trash cans, and mailboxes. Robert Mulligan testified that he was “bombarded by phone calls” for close to a month from people who thought it was unsafe to eat at Jimmy John’s. Concerned about the effect on MikLin’s business, Mulligan and some managers took down the public posters. On March 22, MikLin fired six employees who coordinated the attack and issued written warnings to three who assisted.
The IWW continued its sick leave attack. In a press release issued a day after the terminations, a discharged employee stated: “It just isn’t safe — customers are getting their sandwiches made by people with the flu, and they have no idea.... [Rjather than safeguard public health and do the right thing for their employees and their customers, Jimmy John’s owners Mike and Rob Mulligan are trying to silence us.” On March 30, the IWW issued another press release stating that “[c]us-tomers have a right to know that their sandwich could be filled with germs,” that IWW members have a duty to speak out on this “public health issue,” and that employees “blew the whistle by posting 3000 copies of a poster advising the public of health risks at the sandwich chain.” The release quoted one employee as stating: “The unfettered greed of franchise owner Mike Mulligan and Jimmy John Liautaud himself jeopardizes the health of thousands of customers and workers almost every day. We will speak out until they realize that no one wants to eat a sandwich filled with cold and flu germs.”
B. The NLRB Proceedings. Following a two-day evidentiary hearing, the Board’s Administrative Law Judge (“ALJ”) concluded that MikLin violated Sections 8(a)(1) and 8(a)(3) of the Act. Citing prior Board decisions, the ALJ ruled that “Section 7 [29 U.S.C. § 157] protects employee communications to the public that are part of and related to an ongoing labor dispute,” such as the Sick Day posters and related press releases, unless they are “so disloyal, reckless, or maliciously untrue as to lose the Act’s protections.” To lose Section 7 protection, “an employee’s public criticism ... must evidence ‘a malicious *818 motive’ ” or be made with knowledge of the statements’ falsity or with reckless disregard for their truth or falsity.
The ALJ found that the Sick Day posters were not maliciously untrue. While “it is not literally true that employees could not call in sick,” the ALJ observed, employees “are subject to discipline if they call in sick without finding a replacement.” Thus, the assertion, “SHOOT, WE CAN’T EVEN CALL IN SICK,” was “protected hyperbole.” The ALJ acknowledged record evidence that MikLin had served more than six million sandwiches over its ten-year existence and had been investigated by the Minnesota Department of Health only two times for food borne disease— once in 2006 and once in 2007, when the investigating sanitarian “noted overall compliance with food code requirements and no critical violations.” The ALJ found, however, “it is at least arguable that [Mik-Lin’s] sick leave policy subjects the public to an increased risk of food borne disease,” and MikLin “could have waged its own publicity campaign” to attract consumers. The ALJ made no mention of the false assertion in the open letter accompanying the IWW press release that health code violations occurred at MikLin stores nearly every day. Nor did the ALJ even attempt to analyze and apply the disloyalty principle of Jefferson Standard.
A divided panel of the Board affirmed the ALJ’s findings and conclusions. MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *7 (2014). The majority concluded “that neither the posters nor the press release were shown to be so disloyal; reckless, or maliciously untrue as to lose the Act’s protection.” The public communications “were clearly related to the ongoing labor-dispute concerning the employees’ desire for paid sick leave.... Indeed, any person viewing the posters and press release would reasonably understand that the motive for the communications was to garner support for the campaign to improve the employees’ terms and conditions of employment by obtaining paid sick leave rather than to disparage [MikLin] or its product.” Nor were any of the statements maliciously untrue.
Turning to the question of disloyalty, the majority noted that “Board law has developed considerably in its approach to the question of employee disloyalty.” “To lose the Act’s protection as an act of disloyalty, an employee’s public criticism of an employer must evidence a malicious motive,” even if the-public communication “raise[s] highly sensitive issues such as public safety.” Accepting the majority’s summary of prior Board decisions, the dissenting Member would nonetheless have held the Sick Day posters and press release unprotected, because “it is well established that employees lose the Act’s protection if their means of protest are ‘flagrantly disloyal, wholly incommensurate with any grievances which they may have, and manifested by public disparagement of the employer’s product or undermining of its reputation,’” quoting Five Star Transportation, Inc., 349 N.L.R.B. 42, 44-47 (2007), enforced, 522 F.3d 46 (1st Cir. 2008).
II. “Sick Day” Poster Issues.
It is well established that an employer commits an unfair labor practice if it discharges employees for engaging in concerted activities that are protected by Section 7 of the NLRA, including communications to third parties or to the public that seek to “improve their lot as employees through channels outside the immediate employee-employer relationship.” Eastex, Inc. v. NLRB, 437 U.S. 556, 565, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). Section 10(c) of the Act, however, expressly limits the Board’s broad authority to remedy un *819 lawful employee discharges: “No order of the Board shall require the reinstatement of any individual as an employee ... if such individual was suspended or discharged for cause.” 29 U.S.C. § 160(c). The interplay between Section 7 and Section 10(c) was the critical question the Supreme Court addressed in Jefferson Standard.
A. In Jefferson Standard, the Court upheld the Board’s decision that a broadcasting station did not violate the Act when it fired technicians who distributed handbills “making a sharp, public, disparaging attack upon the quality of the company’s product and its business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.” 346 U.S. at 471, 74 S.Ct. 172. After bargaining negotiations broke down, employees first picketed the station for treating its employees unfairly. When this tactic failed, the employees distributed thousands of handbills, signed “WBT Technicians,” criticizing the station’s poor programming quality and asserting that Jefferson Standard did not value its customers and considered the local city to be a “second-class community.” Id. at 468, 74 S.Ct. 172. The Board found the employee handbills unprotected because the technicians “deliberately undertook to alienate their employer’s customers by impugning the technical quality of his product.” Jefferson Standard Broadcasting Co., 94 N.L.R.B. 1507, 1511 (1951). Though the technicians’ purpose was “to extract a concession from the employer with respect to the terms of their employment,” the Board found that they lost the Act’s protection when they failed to disclose their interests as employees. Id at 1511. The Board reasoned that the technicians lost the Act’s protection because “the gist of [the technicians’] appeal to the public was that the employer ought to be boycotted because he offered a shoddy product to the consuming public — not because he was ‘unfair’ to the employees who worked on that product.” Id. at 1512. The Board declined to decide whether the product disparagement in the handbills would justify discharge “had it been uttered in the context of a conventional appeal for support of the union in the labor dispute.” Id at 1512 n.18.
The Supreme Court, in affirming the Board, decided the case on broader grounds. After quoting the “for cause” language of Section 10(c), the Court declared that “[t]here is no more' elemental cause for discharge of an employee than disloyalty to his employer.” Jefferson Standard, 346 U.S. at 472, 74 S.Ct. 172. Congress in the NLRA “did not weaken the underlying contractual bonds and loyalties of employer and employee.” Id. at 473, 74 S.Ct. 172. Absent a labor controversy, the technicians’ conduct “unquestionably would have provided adequate cause for their disciplinary discharge within the meaning of § 10(c).... The fortuity of the coexistence of a labor dispute affords these technicians no substantial defense.” Id. at 476, 74 S.Ct. 172. Thus, the handbill attack targeting “the quality of the company’s product ... was as adequate a cause for the discharge of its sponsors as if the labor controversy had not been pending.” Id. at 477, 74 S.Ct. 172. Though the Court noted several times that the technicians failed to disclose a connection between their labor dispute and the handbill attack, the Court declined to remand for further consideration of whether the handbills were an “appeal for support in the pending dispute,” rather than “a concerted separable attack,” because the attack would be unprotected either way:
Even if the attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in con *820 ducting the attack have deprived the attackers of the protection of that section, when read in the light and context of the purpose of the Act.
Id. at 477-78, 74 S.Ct. 172.
The Supreme Court’s decision not to remand in Jefferson Standard made clear that the Court’s disloyalty ruling includes communications that otherwise would fall within Section 7 protection, if those communications “mak[e] a sharp, public, disparaging attack upon the quality of the company’s product and its business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.” 346 U.S. at 471, 74 S.Ct. 172. In NLRB v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), the Court confirmed that Section 10(c) “cannot mean that an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects.” But the Court explained that Jefferson Standard “denied the protection of § 7 to activities characterized as ‘indefensible’ because they were there found to show a disloyalty to the workers’ employer which [the] Court deemed unnecessary to carry on the workers’ legitimate concerted activities.” Id., quoting Jefferson Standard, 346 U.S. at 477, 74 S.Ct. 172. Thus, we reject the dissent’s suggestion that Jefferson Standard does not apply in this case because the employees’ disparaging communications “expressly referenced] ongoing labor disputes.” Post at 832.[1]
B. Board decisions applying Jefferson Standard initially recognized that employers may protect their businesses from detrimental product disparagement whether or not an employee attack referenced a labor dispute. See Patterson-Sargent Co., 115 N.L.R.B. 1627, 1630 (1956) (employees’ handbill asserting replacement workers produced defective paint was unprotected “public disparagement of the quality of the employer’s product”); Coca Cola Bottling Works, Inc., 186 N.L.R.B. 1050, 1063-64 (1970) (employees’ leaflet warning that inexperienced workers could leave objects such as roaches, bugs, and dead mice in the company’s bottles was “the very type of [disparaging] conduct” held unprotected in Jefferson Standard).
Though the Supreme Court’s interpretation of the NLRA in Jefferson Standard remains unchanged, “Board law has developed considerably in its approach to the question of employee disloyalty.” MikLin, 361 N.L.R.B. No. 27, at *5 n.18. In 1987, the Board articulated its modern interpretation: “Jefferson Standard held that employees may engage in communications with third parties in circumstances where the communication is related to an ongoing labor dispute and when the communication is not so disloyal, reckless, or maliciously untrue to lose the Act’s protection.” Emarco, Inc., 284 N.L.R.B. 832, 833 (1987); see Am. Golf Corp., 330 N.L.R.B. 1238, 1240 (2000). Although Jefferson Standard did not involve employee public communications that were reckless or maliciously untrue, we do not question the Board’s view that such communications are not entitled to the protection of Section 7 as limited by Section 10(c).[2] Indeed, we applied that *821 standard in St. Luke’s Episcopal-Presbyterian Hosp. v. NLRB, 268 F.3d 575, 580 (8th Cir. 2001), citing Montefiore Hosp., 621 F.2d at 517.
The issue in this case is the Jefferson Standard disloyalty principle — Section 10(e) permits an employer to fire an employee for “making a sharp, public, disparaging attack upon the quality of the company’s product and its business policies, in a manner reasonably calculated to harm the company’s reputation and reduce its income.” 346 U.S. at 471, 74 S.Ct. 172. On this issue, while always purporting to apply Jefferson Standard’s holding, the Board has migrated to a severely constrained interpretation of that decision. “To lose the Act’s protection as an act of disloyalty, an employee’s public criticism of an employer must evidence a malicious motive.” MikLin, 361 N.L.R.B. No. 27, at *5 (quotation omitted). “[E]ven communications that raise highly sensitive issues such as public safety [are] protected where they are sufficiently linked to a legitimate labor dispute and are not maliciously motivated to harm the employer.” Id. at *4-*5.
In our view, the Board fundamentally misconstrued Jefferson Standard in two ways. First, while an employee’s subjective intent is of course relevant to the disloyalty inquiry — “sharp, public, disparaging attack” suggests an intent to harm— the Jefferson Standard principle includes an objective component that focuses, not on the employee’s purpose, but on the means used — whether the disparaging attack was “reasonably calculated to harm the company’s reputation and reduce its income,” 346 U.S. at 471, 74 S.Ct. 172, to such an extent that it was harmful, indefensible disparagement of the employer or its product, id. at 477, 74 S.Ct. 172. By holding that no act of employee disparagement is unprotected disloyalty unless it is “maliciously motivated to harm the employer,” the Board has not interpreted Jefferson Standard — it has overruled it.[3]
Second, the Board’s definition of “malicious motive” for these purposes excludes from Jefferson Standard’s interpretation of Section 10(c) all employee disparagement that is part of or directly related to an ongoing labor dispute. While the employees “may have anticipated that some members of the public might choose not to patronize [MikLin’s] restaurants after reading the posters or press release,” the Board ruled, their public communications were protected activity because “there is no evidence that [their] purpose was to inflict harm on [MikLin].” Rather, “they were motivated by a sincere desire to improve their terms and conditions of employment.” MikLin, 361 N.L.R.B. No. 27, at *6. In other words, the Board refuses to treat as “disloyal” any public communication intended to advance employees’ aims in a labor dispute, regardless of the manner in which, and the extent to which, it harms the employer. As the Court held in Jefferson Standard that its disloyalty principle would apply even if the employees had explicitly related their public disparagement to their ongoing labor dispute, *822 once again the Board has not interpreted Jefferson Standard — it has overruled it.
By requiring an employer to show that employees had a subjective intent to harm, and burdening that requirement with an overly restrictive need to show “malicious motive,” the Board has effectively removed from the Jefferson Standard inquiry the central Section 10(c) issue as defined by the Supreme Court— whether the means used reflect indefensible employee disloyalty. This is an error of law. See George A. Hormel & Co. v. NLRB, 962 F.2d 1061, 1065 (D.C. Cir. 1992). Our prior cases confirm that an employee’s disloyal statements can lose Section 7 protection without a showing of actual malice. In St. Luke’s, we expressly rejected the contention • that public disparagement of an employer “was protected activity unless maliciously false.” 268 F.3d at 579. We explained that cases interpreting Jefferson Standard “establish that an employee exceeds the boundaries of protected activity when she falsely and publicly disparages her employer or its products and services.” Id. at 580. By requiring proof that disloyal conduct was the product of a malicious motive, the Board fundamentally misinterpreted both Jefferson Standard and our decisions construing and applying Jefferson Standard.
Rather than employee motive, the critical question in the Jefferson Standard disloyalty inquiry is whether employee public communications reasonably targeted the employer’s labor practices, or indefensibly disparaged the quality of the employer’s product or services. The former furthers the policy of the NLRA; the latter does not. See Jefferson Standard, 346 U.S. at 476, 74 S.Ct. 172; see also Five Star, 349 N.L.R.B. at 46. This distinction focuses on the type of harm employees’ methods cause. When employees convince customers not to patronize an employer because its labor practices are unfair, subsequent settlement of the labor dispute brings the customers back, to the benefit of both employer and employee. By contrast, sharply disparaging the employer’s product or services as unsafe, unhealthy, or of shoddy quality causes harm that outlasts the labor dispute, to the detriment of all employees as well as the employer. See Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1267 (D.C. Cir. 1997) (en banc), cert. denied, 523 U.S. 1020, 118 S.Ct. 1299, 140 L.Ed.2d 466 (1998); compare Montefiore, 621 F.2d at 517 (efforts by striking doctors to discourage patients from entering the clinic were unprotected, although related to labor dispute, because they “appealed to patients to turn away not out of sympathy with the aims of the striking workers ..., but in the belief that they could not obtain competent treatment there”), and St. Luke’s, 268 F.3d at 580 (nurse’s public statements relating to ongoing labor dispute were unprotected because she “disparaged the quality of patient care being provided by [her employer] in a way guaranteed to adversely affect the hospital’s reputation with prospective patients and the public at large”), with NLRB v. Greyhound Lines, Inc., 660 F.2d 354, 357 (8th Cir. 1981) (bus drivers’ factual statements regarding anticipated service delays were not unprotected because they “did not contain any insults or negative insinuations about the Company’s services or integrity with respect to its customers”).[4]
C. The Board argues, and our dissenting colleagues agree, that its decision is entitled to judicial deference under Chev *823 ron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is certainly well established that “the task of defining the scope of § 7 is for the Board to perform in the first instance as it considers the wide variety of cases that come before it.” NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984) (quotation omitted). But the dissent argues for far greater Board autonomy, relying on the statement in National Cable & Telecommunications Ass’n v. Brand X Internet Services, 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), that a prior court of appeals “construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.” This principle, if applied literally here, would leave the Board free to disregard any prior Supreme Court or court of appeals interpretation of the NLRA. We reject this contention because it is contrary to eighty years of Supreme Court decisions reviewing the Board’s interpretations of this heavily litigated statute.
In the first place, we doubt the statement in Brand X even applies in this case, where the Board itself purported to interpret Jefferson Standard, not apply its own contrary interpretation of the proper interplay between Section 7 and Section 10(c) of the NLRA: “In protecting employee communications that are critical of the employer or its product where the communications relate to a labor dispute, the Board has adhered to the specific holding of Jefferson Standard, ... and its approach has been upheld by numerous courts.” MikLin, 361 N.L.R.B. No. 27, at *5. Brand X does not require a court to defer to an agency’s interpretations of judicial precedent. Numerous prior court of appeals decisions have held that the Board’s interpretation of judicial precedent “is not entitled to judicial deference.” N.Y., N.Y., LLC v. NLRB, 313 F.3d 585, 590 (D.C. Cir. 2002); accord Ne. Beverage Corp. v. NLRB, 554 F.3d 133, 139 (D.C. Cir. 2009); NLRB v. U.S. Postal Serv., 660 F.3d 65, 68 (1st Cir. 2011); see Owen v. Bristol Care, Inc., 702 F.3d 1050, 1054 (8th Cir. 2013). Applying these precedents, we interpret Jefferson Standard de novo.
Second, it is far from settled that Brand X applies to prior decisions of the Supreme Court such as Jefferson Standard. See Brand X, 545 U.S. at 1003, 125 S.Ct. 2688 (Stevens, J., concurring) (agency freedom to reject judicial interpretation of an ambiguous statute “would not necessarily be applicable to a decision by this Court that would presumably remove any pre-existing ambiguity”); United States v. Home Concrete & Supply, LLC, 566 U.S. 478, 132 S.Ct. 1836, 1851-52, 182 L.Ed.2d 746 (2012) (Kennedy, J., dissenting). In Home Concrete, the Court was badly fractured on the issue of how to apply the broad agency deference statement in Brand X; no position commanded a majority.
Third, the Court in Chevron recognized that statutory construction is first and foremost a judicial function: “If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.” 467 U.S. at 843 n.9, 104 S.Ct. 2778. Consistent with this principle, in reviewing Board decisions under the NLRA, the Supreme Court has more than once applied the principle that, “[o]nce we have determined a statute’s clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency’s later interpretation of the statute against our prior determination of the stat *824 ute’s meaning.” Lechmere, Inc. v. NLRB, 502 U.S. 527, 536, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), quoting Maislin Ind., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 131, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); accord Neal v. United States, 516 U.S. 284, 295, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996). In Lechmere, the Court declined to enforce a Board interpretation of Section 7 that “erode[d]” the general rule adopted by the Court in a prior case. Brand X cited Lechmere favorably. 545 U.S. at 984, 125 S.Ct. 2688. Likewise, in NLRB v. Int’l Longshoremen’s Ass’n, 473 U.S. 61, 78, 80, 105 S.Ct. 3045, 87 L.Ed.2d 47 (1985), the Court noted it was “mindful of the rule that the Board’s construction of the Act is due our deference,” but it denied enforcement of the Board’s order because “the Board misconstrued our cases in suggesting that ‘eliminated’ work can never be the object of a work preservation agreement.” These decisions clearly preclude the Board from construing Jefferson .Standard in a manner that fundamentally erodes a disloyalty principle that determined the clear meaning of Section 10(c).
Finally, it is important to recall that in Jefferson Standard the Court went beyond the Board’s ruling, based on Section 7, and defined the interplay between Section 7 and Section 10(c) of the Act. The Court noted that Section 10(c), part of the Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act, amended Section 10(c) so as to limit the Board’s authority to interfere with an employer’s right to discharge employees “for cause.” 346 U.S. at 473-74, 74 S.Ct. 172, quoting H.R. Rep. No. 510 , 80th Cong., 1st Sess. 38-39. In a subsequent decision, the Court noted that Congress designed Section 10(c) “to preclude the Board from reinstating an individual who had been discharged for misconduct,” quoting legislative history stating that the provision was “intended to put an end to the belief, now widely held and certainly justified by the Board’s decisions, that engaging in union activities carries with it a license to loaf, wander about the plants, refuse to work, waste time, break rules, and engage in incivilities and other disorders and misconduct.” Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 217 n.11, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), quoting H.R. Rep. No. 245, 80th Cong., 1st Sess., 42 (1947). Chevron deference must be based on the intent of Congress. We see no basis for concluding that Congress intended that courts defer when the Board narrowly construes a Supreme Court opinion that established the meaning of a statute intended to limit the Board’s authority.
D. Turning to the merits of this case, we review the Board’s factual findings for “substantial evidence on the record as a whole.” Cellular Sales of Mo., LLC v. NLRB, 824 F.3d 772, 775 (8th Cir. 2016) (quotation omitted). Substantial evidence supports the Board’s findings that the employees’ Sick Day posters and press releases were related to their protected concerted effort to improve the terms and conditions of their employ by obtaining paid sick leave. Communications asking the public to support this effort may be within the protection of Section 7 even though they address a sensitive issue, like sick leave in the food service industry. Delineating the boundaries of “indefensible” third-party communications is more difficult when'this connection is present. But as a matter of law, the Board erred in concluding that the employees’ product disparagement was protected Section 7 activity simply because its purpose was to obtain paid sick days. Even communications connected to a labor dispute are unprotected when they constitute a “sharp, public, disparaging attack upon the quality of the company’s product and its business *825 policies.” Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172.
The attack was “sharp,” proceeding “in a manner reasonably calculated to harm the company’s reputation and reduce its income.” Id. at 471, 74 S.Ct. 172. The posters, press releases, and letter were an effective campaign to convince customers that eating Jimmy John’s sandwiches might cause them to become sick. The Sick Day poster warned that the reader was “about to take the sandwich test.” Its enduring image was a MikLin-made Jimmy John’s sandwich that, although appearing like any other, was filled with cold and flu germs. As in Jefferson Standard, the employees were not on strike, but continued to work and collect wages as they attempted to scare customers away from their employer and its products. “Nothing could be further from the purpose of the Act than to require an employer to finance such activities.” Jefferson Standard, 346 U.S. at 476, 74 S.Ct. 172.
Allegations that a food industry employer is selling unhealthy food are likely to have a devastating impact on its business, what the D.C. Circuit called the “equivalent of a nuclear bomb” in a labor-relations dispute. Diamond Walnut Growers, 113 F.3d at 1267. MikLin’s employees maximized this effect, choosing March as a “good time” to launch their attack “because it was flu season.”[5] The employees understood that MikLin’s business was dependent on its “clean” public image, yet directly attacked that image. Like the technicians in Jefferson Standard, the MikLin employees accused their employer of not valuing its customers. See Montefiore Hosp., 621 F.2d at 517; Five Star, 349 N.L.R.B. at 46. By targeting the food product itself, employees disparaged Mik-Lin in a manner likely to outlive, and also unnecessary to aid, the labor dispute. Even if MikLin granted paid sick leave, the image of contaminated sandwiches made by employees who chose to work while sick was not one that would easily dissipate.
The employees’ public claims about their employer’s product were also “materially false and misleading.” St. Luke’s, 268 F.3d at 581. The Sick Day poster graphically told customers that sandwich makers were working when sick by falsely stating, “Shoot, we can’t even call in sick.” The press release and open letter claimed that MikLin jeopardized customers’ health by the almost daily health code violations occurring at MikLin’s stores. Yet the IWW supporters knew MikLin complied with Minnesota Department of Health regulations by requiring employees to call in sick if they had experienced flu-like symptoms in the last 24 hours. As the ALJ noted: “Given [MikLin’s] record over a 10-year period one could regard the risk of becoming ill by eating at one of [its] shops to be infinitesimal.” MikLin, 361 N.L.R.B. No. 27, at *23. This factor made the MikLin employees’ attack even more “indefensible” than that at issue in Jefferson Standard, where the technicians “did not misrepresent, at least willfully, the facts they cited to support their disparaging report.” 346 U.S. at 472, 74 S.Ct. 172. As dissenting Board Member Johnson stated, “Any employee who is willing to make up allega *826 tions out of whole cloth against his or her employer is obviously far more disloyal, in any meaningful sense of that word, than one who acts upon a reasonable but mistaken belief.” MikLin, 361 N.L.R.B. No. 27, at *12 (Johnson, M., dissenting in part).
From the array of possible tactics, the employees selected public communications that were sure “to harm [MikLin’s] reputation and reduce its income.” Jefferson Standard, 346 U.S. at 471, 74 S.Ct. 172. This was a “continuing attack ... upon the very interests which the attackers were being paid to conserve and develop.” 346 U.S. at 476, 74 S.Ct. 172. The Act does not protect such calculated, devastating attacks upon an employer’s reputation and products. See Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532, 537 (D.C. Cir. 2006). Although applying Jefferson Standard’s disloyalty principle is often difficult, the employees’ third-party communications demonstrated “such detrimental disloyalty as to provide ‘cause’” for MikLin to discharge and discipline those responsible for the campaign. 346 U.S. at 472, 74 S.Ct. 172. We decline to enforce the Board’s contrary Order.
E. After learning that IWW supporters were about to “plaster” the area surrounding MikLin stores with Sick Day posters, Robert Mulligan posted this message on an employee-created “Jimmy John’s Anti-Union” Facebook page:
... [T]he IWW are threatening to put up thousands of posters that threaten our business and your jobs. They plan on doing this if we don’t meet with them which we will not do. I encourage anyone to take down any posters they may see around the twin cities. These posters are defamatory.
The ALJ concluded this post violated Section 8(a)(1) because its target, the sandwich posters, was concerted activity protected by Section 7. The Board affirmed the’ ALJ, one member dissenting. Section 8(a)(1) forbids employers to “interfere with, restrain, or coerce” employees in the exercise of their Section 7 rights. Because we conclude the posters were not protected Section 7 activity, substantial evidence does not support the Board’s decision. Soliciting employees to remove unprotected public communications did not “interfere with, restrain or coerce” employees in their exercise of Section 7 rights. We decline to enforce this portion of the Board’s Order.
III. Other Issues.
MikLin also appeals the Board’s conclusion that it committed two other violations of Section 8(a)(1) during the IWW’s organizing campaign in late 2010 and early 2011. “We will enforce the Board’s order as long as the Board correctly applied the law, and its findings are supported by substantial evidence, even if we might have reached a different decision on de novo review.” NLRB v. Rockline Indus., Inc., 412 F.3d 962, 966 (8th Cir. 2005). The panel unanimously enforced these portions of the Board’s Order. We agree.
A. Facebook Postings by MikLin Supervisors. In response to the IWW’s public organizing campaign, a rank-and-file Mik-Lin employee created the “Jimmy John’s Anti-Union” Facebook page. Its membership grew to include Robert Mulligan, MikLin managers, and other employees who opposed the IWW. The Facebook page was open to viewing by anyone with a Facebook account, including IWW supporters and neutral employees.
Rene Nichols was assistant manager of the MikLin store where IWW-supporter David Boehnke worked. Nichols posted on the Facebook page listing Boehnke’s telephone number and suggesting that employees text Boehnke to “let him know *827 how they feel,” followed by the comment, “Fuck You David! Forever.” When a former MikLin employee posted a picture on the Facebook page showing Boehnke with feces on the brim of his hat and the IWW logo on his shirt, and displaying the words “Shithead” and “Liar” and a toilet bowl in the background, Nichols commented, “Haaaa Ben — 2 David — 0 Fartbag.” Two other MikLin managers, Eddie Guerrero and Melissa Erickson, posted that the photo should be posted everywhere.
The ALJ ruled that Nichols’s posts violated Section 8(a)(1) by encouraging employees to harass Boehnke for protected activities. The Board affirmed that ruling and also ruled that managers Guerrero and Erickson violated Section 8(a)(1) by encouraging employees to disparage a union supporter. The Board found that Nichols’s posts, and the Guerrero and Erickson posts encouraging other employees to widely disseminate a degrading picture of an employee leader of the IWW, “would reasonably intimidate both Boehnke and other employees who would not want to be subject to the same kind of humiliation and ridicule, thereby dissuading them from supporting the Union.” MikLin, 361 N.L.R.B. No. 27, at *8.
Section 8(c) of the Act provides that “[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit.” “Accordingly, to violate Section 8(a)(1), a statement must contain a threat of reprisal or force or promise of benefit.” Greater Omaha Packing Co. v. NLRB, 790 F.3d 816, 822 (8th Cir. 2015). “Words of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1).” Sears, Roebuck & Co., 305 N.L.R.B. 193, 193 (1991). However, an employer’s ridicule of union supporters in front of other employees may violate Section 8(a)(1) where it is likely to discourage employees from exercising their Section 7 rights. See Dayton Hudson Corp., 316 N.L.R.B. 477, 483 (1995).
We conclude that substantial evidence supports the Board’s conclusion that the supervisors’ public effort to disparage and degrade union leader Boehnke restrained or coerced MikLin employees in the exercise of their Section 7 rights, by causing other employees to fear they would incur similar treatment if they supported the IWW. Though we now hold that MikLin lawfully terminated Boehnke prior to most of these posts for his role in the Sick Day poster attack, the degrading posts targeted Boehnke for his general support of the IWW and thus coerced other employees not to engage in protected activity. We enforce this portion of the Board’s Order..
B. Removal of In-Store Union Literature. After the IWW lost the representation election, it filed unfair labor practice charges and objections to the election with the Board. The parties settled this dispute with a Board-approved “Stipulation to Set Aside Election” in which they agreed that the October 2010 election was set aside and the IWW could request a “Rerun Election.” The settlement included a provision that MikLin “does not admit to violating the National Labor Relations Act as alleged, and approval by the Regional Director does not constitute a determination that [MikLin] has violated the Act.”
At the evidentiary hearing, pro-union employee Travis Erickson testified that, after the settlement, MikLin posted on the employee “tack board” in the back of the store where Erickson worked the Notice to Employees required by the Stipulation and a posting giving MikLin’s “explanation to employees of what the settlement meant.” In response, Erickson posted on *828 the same board an IWW “FAQ about the Union 'Election & Settlement,” giving the union’s position on these issues, and a copy of the amended unfair labor practice charges the IWW had filed with the Board. Erickson testified that these postings were repeatedly removed before he came to work, and one set had been smeared with grease pen marks. Erickson and three other union supporters eventually confronted area manager Jason Effertz, who admitted taking down the posts and said “our lawyers told us to take them down.” Effertz later told Erickson, “You guys can put up anything you want about who you are and what you stand for, but you’re not allowed to put up stuff talking about the election.” MikLin introduced no evidence contradicting this testimony.
The ALJ concluded that removal of the union materials’ violated Section 8(a)(1). The Board affirmed. On appeal, MikLin argues it had the right to prohibit this union literature because statements on the FAQ notice “were materially false representations of events, processes and outcomes of past NLRB proceedings, and were intended to undermine the authority of management,” citing Eastex, 487 U.S. at 570-73, 98 S.Ct. 2505.
Section 8(a)(1) makes it an unfair labor practice for an employer to “interfere with” employees in the exercise of their Section 7 rights, which include the right “to bargain collectively through representatives of their own choosing.” As the Supreme Court said in Central Hardware Co. v. NLRB, 407 U.S. 539, 542-43, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), the right of self-organization
includes both the right of union officials to discuss organization with employees, and the right of employees to discuss organization among themselves.... But organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others.
“The inquiry under § 8(a)(1) is an objective one which asks whether, considering the entire factual context, the employer’s conduct reasonably tends to interfere with the employees’ exercise of their section 7 rights.” Mississippi Transp., Inc. v. NLRB, 33 F.3d 972, 977-78 (8th Cir. 1994).
Here, some MikLin employees engaged in a concerted organizing campaign that resulted in a contested election followed by the filing of unfair labor practice charges and election objections that were settled by a Board-approved Stipulation authorizing a Rerun Election. The record contains undisputed testimony that Mik-Lin posted its explanation of these NLRB proceedings on employee “tack boards” in the back of its stores and then removed the IWW’s responsive FAQ notice, explaining that “[y]ou guys can put up anything you want about who you are and what you stand for, but you’re not allowed to put up stuff talking about the election.” A more clear-cut ease of interfering with the employees’ Section 7 right to effectively communicate about their ongoing organizational activity is hard to imagine. While employees have no statutory right to use their employer’s bulletin boards, “where by policy or practice, the company permits employee access to bulletin boards for any purpose, section 7 ... secures the employees’ right to post union materials.” Roadway Exp., Inc. v. NLRB, 831 F.2d 1285, 1290 (6th Cir. 1987); see Healthbridge Mgmt, LLC v. NLRB, 798 F.3d 1059, 1073 (D.C. Cir. 2015); NLRB v. Honeywell, Inc., 722 F.2d 405, 406-07 (8th Cir. 1983).
MikLin introduced no evidence supporting its implausible contention that removal of an IWW flyer that gave employees the union’s contrary interpretation of the *829 NLRB proceedings was necessary to maintain the “authority of management.” Therefore, substantial evidence supports the Board’s conclusion that removal of the flyers and copies of the IWW amended charge violated Section 8(a)(1) of the Act. We enforce this portion of the Board’s Order.
IV. Conclusion.
For the foregoing reasons, we grant enforcement of the Board’s Decision and Order except as to paragraphs 4, 5, and 6 of the Amended Conclusions of Law and paragraphs 1(d), 1(e), and 2(a)-(g) of the Order. We note that, after we enforced its order in part in Greater Omaha, the Board filed a proposed form of judgment, which we entered when the company filed no objection. 790 F.3d at 825-28. We leave to the parties whether to follow that procedure in this case.

. On this issue, we disagree with the contrary conclusion of the panel majority in DirecTV, Inc. v. NLRB, 837 F.3d 25, 35-36 (D.C. Cir. 2016).

. To be unprotected on this ground, employee public statements must be "made with knowledge of their falsity or with reckless disregard for their truth or falsity.” MikLin, 361 N.L.R.B. No. 27, at *3 (quotation omitted). This standard derives from the Supreme Court’s decision in Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 64-65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), that statements made during a union representation campaign can be grounds for a *821 state law libel action only if the plaintiff meets the "actual malice” standard adopted in First Amendment libel cases. Linn did not address the distinct issue of employee public disparagement of an employer or its products and services. Nothing in Jefferson Standard suggests disloyalty, to be unprotected, requires proof of actual malice.

. Of course, if employees actually harbor an intent to harm their employer’s business for improper motives, their conduct falls outside the protection Section 7 affords. See NLRB v. Red Top, Inc., 455 F.2d 721, 725-26 (8th Cir. 1972). But the Board's leap from the relevance of motive to a required finding of "malicious motive” is contrary to the Court’s analysis in Jefferson Standard.

. The Board did not cite Diamond Walnut Growers or St. Luke's, the most relevant circuit court authorities. It dismissed Coca Cola as Board precedent that "has been implicitly overruled.” MikLin, 361 N.L.R.B. No. 27, at *5 n.18.

. The Board majority emphasized "there is no evidence that the communications were made ‘at a critical time in the initiation’ of [Mik-Lin’s] business,” a fact present in Jefferson Standard. MikLin, 361 N.L.R.B. No. 27, at *6 (emphasis added). Either the Board was limiting Jefferson Standard to its facts — a clear error of law — or its interpretation of the evidence in this case was simply disingenuous. Employees' conscious decision to scare Mik-Lin customers during flu season was strong evidence of their intent to disparage MikLin "at a critical time.”